FILED

2012 OCT 31 P 1: 32

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

TOM LALLAS (SBN 66512)
MARK D. HURWITZ (SBN 151159)
LEVY, SMALL & LALLAS
A Partnership Including Professional Corporations
815 Moraga Drive
Los Angeles, California  90049
Telephone:  (310) 471-3000
Facsimile:   (310) 471-7990
Email:        tlallas@lsl-la.com

Attorneys for Plaintiff
SQUARE 1 BANK

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

JSC

SQUARE 1 BANK,

Plaintiff,

vs.

HENRY LO, an individual; and
ABSOLUTELYNEW, INC., a California
corporation,

Defendants.

Case No. 12       5595

COMPLAINT

DEMAND FOR TRIAL BY JURY

FILE BY FAX

COMPLAINT

1   Plaintiff Square 1 Bank ("Plaintiff") alleges as follows:

2   **JURISDICTION, PARTIES AND VENUE**

3   1.    The amount in controversy in this action exceeds the sum of $75,000,

4   exclusive of interest and costs.  The jurisdiction of this Court is invoked pursuant

5   to 28 U.S.C. Section 1332(a), which confers subject matter jurisdiction on the

6   United States District Court in all cases in which there is diversity of citizenship

7   and the amount in controversy exceeds the sum of $75,000, exclusive of interest

8   and costs.

9   2.    Plaintiff is now, and at all times material hereto was, a state bank

10  chartered under the laws of the State of North Carolina, with its home office and

11  principal place of business in the State of North Carolina.  Plaintiff is duly

12  qualified to do business and doing business in the State of California.

13  3.    Plaintiff is informed and believes, and on that basis alleges, that

14  defendant Henry Lo ("Lo") is now, and at all material times hereto has been, a

15  citizen of the State of California, with his residence and domicile in the County of

16  San Francisco.

17  4.    Plaintiff is informed and believes, and on that basis alleges, that

18  defendant AbsolutelyNew, Inc. ("ANI") is now, and at all material times hereto

19  has been, a corporation organized and existing under the laws of the State of

20  California, with its principal place of business in the County of San Francisco,

21  State of California.

22  5.    Venue is properly laid in this Court pursuant to 28 U.S.C. Section

23  1391(a), as Lo is a resident of the State of California and the County of San

24  Francisco, and ANI's principal place of business is located in the County of San

25  Francisco, State of California.

26

27

28

-1-                                      **COMPLAINT**

1

## GENERAL ALLEGATIONS

2

**A.    Lo's Employment at ANI.**

3

    6.    From May 2007 through October 2010, Lo was employed by ANI,

4

and for most of that period, Lo was ANI's Chief Financial Officer.

5

**B.    The Loan Agreement Between Plaintiff and ANI and Plaintiff's**

6

      **Rights to ANI's Assets.**

7

    7.    On or about September 21, 2009, Plaintiff entered into a Loan and

8

Security Agreement ("Loan Agreement") with ANI, a copy of which is attached

9

hereto as Exhibit "1".

10

    8.    Before Plaintiff decided to enter into the Loan Agreement, ANI

11

provided Plaintiff with actual and projected financial statements for ANI

12

(collectively, the "Pre-Agreement Financials"), including without limitation

13

(i) annual financial statements for the year ended December 31, 2008, (ii) monthly

14

financial statements for the months of January, February, March, April, May and

15

June 2009, and (iii) projected monthly financial statements for the months of July,

16

August, September, October, November and December 2009.

17

    9.    Pursuant to the Loan Agreement, Plaintiff agreed to make loans and

18

advances to ANI in accordance with the terms thereof, and ANI, among other

19

things, (i) agreed to repay those loans with interest when due, in accordance with

20

the terms of the Loan Agreement, and (ii) granted Plaintiff a first position security

21

interest (subject to limited specified exceptions) in all of ANI's personal property

22

("Collateral"), as described in Exhibit B-1 to the Loan Agreement.

23

    10.    Plaintiff perfected its first position security interest in the Collateral

24

by, among other things, filing a UCC-1 financial statement with the Office of the

25

Secretary of State of the State of California on September 24, 2009 as document

26

number 22426920002, filing number 09-7209138908, a copy of which is attached

27

hereto as Exhibit "2".

28

**COMPLAINT**

1    11.    From time to time, Plaintiff made loans and advances to ANI under
2    the Loan Agreement, beginning with an initial advance of $370,000 on September
3    22, 2009.

4    12.    Throughout the course of the financing relationship between Plaintiff
5    and ANI pursuant to the Loan Agreement, ANI provided to Plaintiff, generally on
6    a monthly basis, monthly financial statements for ANI for each month from July
7    2009 through and including June 2012 (collectively, the "Post-Agreement
8    Financials").

9    13.    ANI has defaulted on its obligations under the Loan Agreement in
10    that, among other things, it has failed to pay the indebtedness due and owing to
11    Plaintiff. As of October 31, 2012, the amount due and owing by ANI to Plaintiff
12    is at least $4,612,310.63, plus interest from and after October 31, 2012 and other
13    fees and charges pursuant to the Loan Agreement ("Indebtedness").

14    14.    Pursuant to Section 9.1 of the Loan Agreement, Plaintiff has declared
15    and hereby declares the Indebtedness to be immediately due and payable, and all
16    obligations owing by ANI under the Loan Documents became immediately due
17    and payable.

18    15.    As a result of ANI's default under the Loan Agreement, Plaintiff has
19    the right to resort to the Collateral, including without limitation to collect any
20    accounts receivable or other payment obligations owing to ANI.

21    **C.    Lo's Obligations Arising from His Use of ANI Funds.**

22    16.    Among the obligations owing to ANI that Plaintiff is entitled to
23    collect are the sums owing by Lo to ANI resulting from Lo's use of ANI funds for
24    purposes other than ANI's business purposes or payments of the Indebtedness.

25    **1.    The EDD Cashier's Checks.**

26    17.    Between October 2007 and September 2010, Lo used ANI funds to
27    purchase 23 cashier's checks, totaling $328,447.38 (the "EDD Cashier's Checks"),
28    payable to Bank of America, Citibank, Wells Fargo Bank ("Wells Fargo"), and

1  Charles Schwab, which were not payments for, on behalf of, or for the benefit of,
2  ANI.

3       18.    Lo caused ANI's books and records to reflect that the ANI funds used
4  to purchase the EDD Cashier's Checks were for payments of ANI's obligations to
5  the State of California Employment Development Department ("EDD"). ANI
6  learned in or about May 2012 that EDD never received any of the funds or
7  proceeds from the EDD Cashier's Checks.

8              **2.    The Legal Notice Cashier's Checks.**

9       19.    Between April 2008 and November 2008, Lo used ANI funds to
10  purchase 10 cashier's checks, totaling $400,676.00 (the "Legal Notice Cashier's
11  Checks"), payable to Wells Fargo, which were not payments for, on behalf of, or
12  for the benefit of, ANI.

13       20.    Lo caused ANI's books and records to reflect that the Legal Notice
14  Cashier's Checks, and the ANI funds used to purchase them, were for payments in
15  response to purported legal notices from Wells Fargo ("Legal Notices") reflecting
16  that the Internal Revenue Service ("IRS") had required Wells Fargo to hold or
17  withdraw funds from a closed account of ANI's predecessor. ANI learned in or
18  about May 2012 that Wells Fargo never issued any of the Legal Notices.

19              **3.    The City Cashier's Checks.**

20       21.    Between December 2007 and March 2009, Lo used ANI funds to
21  purchase three cashier's checks, totaling $58,125.00 (the "City Cashier's
22  Checks"), payable to Bank of America, which were not payments for, on behalf of,
23  or for the benefit of, ANI.

24       22.    Lo caused ANI's books and records to reflect that the ANI funds used
25  to purchase the City Cashier's Checks were for payments of ANI's payroll tax
26  liabilities to the City and County of San Francisco ("City"). ANI learned in or
27  about May 2012 that the City never received any of the funds or proceeds from the
28  City Cashier's Checks.

-4-                          **COMPLAINT**

1    **4.     The AMEX Payments.**

2         23.    Between December 2010 and February 2012, after ANI terminated

3    Lo's employment, Lo nonetheless obtained online access to ANI's operating

4    account at Union Bank ("ANI Union Bank Account") and caused 12 online

5    payments, totaling $239,052.76, to be made from the ANI Union Bank Account to

6    American Express to pay Lo's personal obligations on his own American Express

7    charge card (the "AMEX Payments").  ANI did not have an American Express

8    card, and the AMEX Payments were not payments for, on behalf of, or for the

9    benefit of, ANI.

10        24.    Although he was not employed by ANI at the time of the AMEX

11   Payments, Lo caused ANI's books and records to reflect that the AMEX Payments

12   were refunds to ANI's clients.  All but one of the AMEX Payments were between

13   $14,900 and $26,750 each, a range within which ANI's contracts with its clients

14   typically fall.  The AMEX Payments ceased only after ANI discovered, in or about

15   March 2012, that the ANI Union Bank Account had been accessed without

16   authorization.

17        **5.     The PayPal Payments.**

18        25.    Between January 2010 and February 2012, most of which period was

19   after ANI terminated Lo's employment, Lo used the online PayPal payment

20   service to cause 145 payments, totaling $564,310.54, to be made from ANI Union

21   Bank Account to an account called "Event Services" that Lo controlled (the

22   "PayPal Payments").  The PayPal Payments were not payments for, on behalf of,

23   or for the benefit of, ANI.

24        26.    Although he was not employed by ANI at the time that most of the

25   PayPal Payments were made, Lo caused ANI's books and records to reflect that

26   the PayPal Payments were for payment of ANI obligations to the IRS.  ANI

27   learned in or about May 2012 that the IRS never received any of the PayPal

28   Payments.

**COMPLAINT**

6.     **The Debit Card Payments.**

27.    Between January 2010 and February 2012, most of which period was after ANI terminated Lo's employment, Lo used a debit card for an ANI account at Bank of America to make hundreds of payments, which ANI did not authorize, totaling $160,005.65 (the "Debit Card Payments").  The Debit Card Payments were for Lo's personal benefit and were not payments on behalf of, or for the benefit of, ANI.

28.    Although he was not employed by ANI at the time that most of the Debit Card Payments were made, Lo caused ANI's books and records to reflect that the Debit Card Payments were for payment of ANI expenses.  The Debit Card Payments ceased only after ANI discovered, in or about March 2012, that Lo had used the debit card without authorization.

7.     **Discovery of the Misdirected ANI Funds.**

29.    In April 2011, long before ANI or Plaintiff were aware of Lo's foregoing uses of ANI's funds, including the EDD Cashier's Checks, Legal Notice Cashier's Checks, City Cashier's Checks, AMEX Payments, PayPal Payments and Debit Card Payments (collectively, "Misdirected ANI Funds"), an investor in ANI hired an outside consultant, OutForce LLC ("OutForce"), to review and bring order to ANI's books and records.

30.    ANI and Plaintiff were not aware of, and through the exercise of reasonable diligence could not have discovered, Lo's use of the Misdirected ANI Funds until at least February 2012, when OutForce first became suspicious of certain transactions involving Misdirected ANI Funds.

31.    Plaintiff has been damaged as a result of the transactions involving Misdirected ANI Funds in that, among other things, the Misdirected ANI Funds (a) were not used to pay any part of the Indebtedness, (b) were not used to reduce ANI's obligations to other creditors and thereby enhance the availability of ANI's assets to satisfy the Indebtedness, and (c) were Collateral to which Plaintiff could

**COMPLAINT**

1    have resorted to satisfy the Indebtedness had the Misdirected ANI Funds not been
2    used for other purposes and put beyond Plaintiff's reach.

3                               **FIRST CLAIM FOR RELIEF**

4                        **(Breach of Written Contract against ANI)**

5         32.    Plaintiff refers to paragraphs 1 through 31, inclusive, and
6    incorporates those paragraphs by reference herein as though fully set forth herein.

7         33.    Plaintiff and ANI entered into the Loan Agreement as alleged above.

8         34.    Plaintiff has performed each and every obligation under the Loan
9    Agreement required on its part to be performed, except for those provisions, terms
10   and conditions which have been excused or waived.

11        35.    As alleged above, ANI breached its obligations under the Loan
12   Agreement in that, among other things, it has failed to pay the Indebtedness due
13   and owing to Plaintiff.

14        36.    As a result of ANI's breach of the Loan Agreement, Plaintiff has been
15   damaged in the sum of at least $4,612,310.63 as of October 31, 2012, plus interest
16   from and after October 31, 2012 and other fees and charges pursuant to the Loan
17   Agreement.

18        37.    Pursuant to the terms and conditions of the Loan Agreement, Plaintiff
19   is entitled to all of its costs, including reasonable attorneys' fees incurred in
20   enforcing the Loan Agreement and collecting the Indebtedness.

21                            **SECOND CLAIM FOR RELIEF**

22                          **(Negligence against ANI and Lo)**

23        38.    Plaintiff refers to paragraphs 1 through 31, inclusive, and
24   incorporates those paragraphs by reference herein as though fully set forth herein.

25        39.    Upon the execution of the Loan Agreement, ANI and Lo knew that
26   Plaintiff held a security interest in the Collateral, and ANI and Lo owed Plaintiff a
27   duty of care, among other things, to protect and preserve the Collateral.

28

                                    -7-                          **COMPLAINT**

40.   ANI and Lo breached their duty of care by causing or allowing ANI funds to be diverted to other purposes on or after September 21, 2009, including (a) $161,493 in Misdirected ANI Funds from January through September 2010 and (b) $824,179 in Misdirected ANI Funds on or after October 1, 2010.

41.   As a result of the breaches by ANI and Lo of their duty of care, Plaintiff has been damaged in an amount to be proved at trial, and in any event in the sum of at least $985,672.

### THIRD CLAIM FOR RELIEF

### (Impairment of Collateral against ANI and Lo)

42.   Plaintiff refers to paragraphs 1 through 31, inclusive, and incorporates those paragraphs by reference herein as though fully set forth herein.

43.   ANI and Lo knew that pursuant to the Loan Agreement, Plaintiff had a security interest in the Collateral to secure performance of ANI's obligations to Plaintiff.

44.   ANI and Lo owed a duty to Plaintiff not to impair the value of the Collateral, and not to engage in any conduct that would impair the value of the Collateral, including without limitation ANI's funds.

45.   ANI and Lo breached the foregoing duty by causing or allowing ANI funds to be diverted to other purposes on or after September 21, 2009, including (a) $161,493 in Misdirected ANI Funds from January through September 2010 and (b) $824,179 in Misdirected ANI Funds on or after October 1, 2010.

46.   As a result of the breaches by ANI and Lo of their duty, Plaintiff's security interest in the Collateral has been impaired since the Misdirected ANI Funds are no longer available to satisfy the Indebtedness. Plaintiff accordingly has been damaged in an amount according to proof, and in any event in the amount of at least $985,672.

**COMPLAINT**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## FOURTH CLAIM FOR RELIEF

### (Negligent Misrepresentation against ANI and Lo)

47.    Plaintiff refers to paragraphs 1 through 31, inclusive, and incorporates those paragraphs by reference herein as though fully set forth herein.

48.    To induce Plaintiff to enter into the Loan Agreement and to make loans and advances to ANI thereunder from time to time, ANI and Lo made various representations to Plaintiff concerning ANI's assets, liabilities and financial condition ("Representations").

49.    The Representations include without limitation (a) the Pre-Agreement Financials, which ANI and Lo provided to Plaintiff in or before August 2009, and (b) Post-Agreement Financials that ANI and Lo provided to Plaintiff on a monthly basis from approximately September 2009 through at least February 2012.

50.    At the time ANI and Lo made the Representations, the Representations were false, in that the Representations (a) did not account for the Misdirected ANI Funds and (b) did not explain that the Misdirected ANI Funds were used for purposes other than those reflected in the Representations.

51.    ANI and Lo made the Representations with the intent to induce Plaintiff to enter into the Loan Agreement and to make loans and advances to ANI thereunder from time to time.

52.    At the time that ANI and Lo made the Representations, they should have known that the Representations were not true and did not have any reasonable basis for believing the Representations to be true.

53.    Plaintiff actually and justifiably relied on the Representations in, among other things, entering into the Loan Agreement and making loans and advances thereunder to ANI. If not for the Representations, Plaintiff would not have entered into the Loan Agreement or made loans and advances to ANI thereunder, and Plaintiff would not have suffered a loss of at least the

-9-                                         **COMPLAINT**

1  $4,612,310.63 sum of the Indebtedness upon ANI's default on its obligations to
2  Plaintiff.

3      54.    As  a  result  of  its  actual  and  justifiable  reliance  on  the
4  Representations, Plaintiff has been damaged in an amount according to proof, and
5  in any event in the amount of at least the $4,612,310.63 sum of the Indebtedness,
6  in that, among other things, (a) ANI defaulted on its obligations to Plaintiff under
7  the Loan Agreement, (b) the Indebtedness remains unpaid, and (c) Plaintiff has
8  been unable to resort to the Misdirected ANI Funds to satisfy the Indebtedness.

9                          **FIFTH CLAIM FOR RELIEF**
10                          **(Conversion against Lo)**

11     55.    Plaintiff  refers  to  paragraphs  1  through  31,  inclusive,  and
12  incorporates those paragraphs by reference herein as though fully set forth herein.

13     56.    Pursuant to its security interest under the Loan Agreement, which it
14  has duly perfected, and as the result of ANI's defaults thereunder, Plaintiff was at
15  all times material hereto entitled to the immediate ownership and possession of the
16  Collateral, including without limitation all Misdirected ANI Funds and any right
17  of ANI to all Misdirected ANI Funds, whether the transactions, by which the
18  Misdirected ANI Funds were used for purposes other than ANI's business,
19  occurred before or after execution of the Loan Agreement.

20     57.    Lo has exercised dominion over, and has acted to deprive Plaintiff of
21  its interest in, the Collateral by, among other things, causing the Misdirected ANI
22  Funds to be used for purposes other than ANI's business purposes or satisfaction
23  of the Indebtedness.

24     58.    As a proximate result of the foregoing conversion of Collateral,
25  Plaintiff has suffered damages in an amount according to proof but in no event
26  less than $1,750,617, including the sum of all Misdirected ANI Funds.

27     59.    In addition, Plaintiff is entitled pursuant to California Civil Code
28  section 3336 to recover from Lo fair compensation for the time and money that

                          -10-                          **COMPLAINT**

1   Plaintiff has expended in pursuit of the Collateral, including the Misdirected ANI
2   Funds.

3   **SIXTH CLAIM FOR RELIEF**

4   **(Money Had and Received against Lo)**

5   60.   Plaintiff refers to paragraphs 1 through 31, inclusive, and
6   incorporates those paragraphs by reference herein as though fully set forth herein.

7   61.   At various times through and including February 2012, Lo became
8   indebted to ANI in the aggregate sum of at least $1,750,617 for money had and
9   received by Lo that was applied to the use and benefit of Lo.

10   62.   Pursuant to the Loan Agreement, upon ANI's default on its
11   obligations thereunder, Plaintiff is entitled, among other things, to collect the
12   obligations owing by Lo to ANI.

13   63.   Despite demand by Plaintiff and ANI, Lo has failed to pay the
14   foregoing obligations, and there is now due and owing to Plaintiff the sum of at
15   least $1,750,617, together with interest thereon at the maximum rate allowed by
16   law.

17   **SEVENTH CLAIM FOR RELIEF**

18   **(Implied Contract against Lo)**

19   64.   Plaintiff refers to paragraphs 1 through 31, inclusive, and
20   incorporates those paragraphs by reference herein as though fully set forth herein.

21   65.   By reason of Lo's conduct with respect to the Misdirected ANI
22   Funds, a contract is implied in law by which Lo was obligated to repay to ANI the
23   sum of all Misdirected ANI Funds (the "Implied Contract").

24   66.   Pursuant to the Loan Agreement, upon ANI's default on its
25   obligations thereunder, Plaintiff is entitled, among other things, to enforce the
26   Implied Contract against Lo.

27   67.   Despite demand by Plaintiff and ANI, Lo has failed to pay his
28   obligations under the Implied Contract, and there is now due and owing to

-11-                                           **COMPLAINT**

1   Plaintiff the sum of at least $1,750,617, together with interest thereon at the

2   maximum rate allowed by law.

3                   **EIGHTH CLAIM FOR RELIEF**

4          **(Unjust Enrichment and Restitution against Lo)**

5       68.   Plaintiff refers to paragraphs 1 through 31, inclusive, and

6   incorporates those paragraphs by reference herein as though fully set forth herein.

7       69.   Lo has been unjustly enriched, at the expense of Plaintiff and ANI, in

8   that the Misdirected ANI Funds were applied for the use and benefit of Lo and not

9   for ANI's business purposes or to satisfy the Indebtedness owing to Plaintiff.

10      70.   Pursuant to the Loan Agreement, upon ANI's default on its

11   obligations thereunder, Plaintiff is entitled, among other things, to collect the

12   restitution owing by Lo with respect to the Misdirected ANI Funds.

13      71.   Lo is obligated to make restitution to Plaintiff in the sum of the

14   Misdirected ANI Funds, and in any event in the sum of at least $1,750,617.

15

16      WHEREFORE, Plaintiff prays for judgment as follows:

17      1.   On the First Claim for Relief against ANI, damages in the principal

18   amount of at least $4,612,310.63 as of October 31, 2012, together with accrued

19   and accruing interest, charges, attorneys' fees and costs pursuant to the terms of

20   the Loan Agreement;

21      2.   On the Second Claim for Relief against ANI and Lo, damages in the

22   principal amount of at least $985,672, together with interest thereon at the

23   maximum rate allowed by law;

24      3.   On the Third Claim for Relief against ANI and Lo, damages in the

25   principal amount of at least $985,672, together with interest thereon at the

26   maximum rate allowed by law;

27

28

                 **COMPLAINT**

1    4.    On the Fourth Claim for Relief against ANI and Lo, damages in the

2  principal amount of at least $4,612,310.63 as of October 31, 2012, together with

3  interest thereon at the maximum rate allowed by law;

4    5.    On the Fifth Claim for Relief against Lo, (a) damages in the principal

5  sum of at least $1,750,617, together with interest thereon at the maximum rate

6  allowed by law, and (b) fair compensation for the time and money that Plaintiff

7  has expended in pursuit of the Collateral, including the Misdirected ANI Funds;

8    6.    On the Sixth Claim for Relief against Lo, damages in the principal

9  sum of at least $1,750,617, together with interest thereon at the maximum rate

10  allowed by law;

11    7.    On the Seventh Claim for Relief against Lo, damages in the principal

12  sum of at least $1,750,617, together with interest thereon at the maximum rate

13  allowed by law;

14    8.    On the Eighth Claim for Relief against Lo, restitution in the sum of at

15  least $1,750,617, together with interest thereon at the maximum rate allowed by

16  law;

17    9.    Costs of suit incurred herein; and

18    10.    Such other and further relief as the Court deems just and proper.

19

20  DATED: October 31, 2012                    TOM LALLAS
                                              MARK D. HURWITZ
21                                            LEVY, SMALL & LALLAS

22

23                                            By:
                                                       Tom Lallas
24                                            Attorneys for Plaintiff
                                              Square 1 Bank
25

26

27  28846-1

28

                                 -13-                        COMPLAINT

1

## DEMAND FOR TRIAL BY JURY

2   Pursuant to Federal Rule of Civil Procedure 38, Plaintiff hereby demands

3 trial by jury on all issues triable by jury in the above-captioned action.

4

5 DATED: October 31, 2012    TOM LALLAS
             MARK D. HURWITZ
6            LEVY, SMALL & LALLAS

7

8          By:
               Tom Lallas
9           Attorneys for Plaintiff
           Square 1 Bank

10

11

12 28846-1

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-14-         **COMPLAINT**

**LOAN AND SECURITY AGREEMENT**

**FOR**

**ABSOLUTELYNEW, INC.**

**AND**

**ABSOLUTELYNEW HOLDINGS, INC.**

square 1 bank

This LOAN AND SECURITY AGREEMENT (the "Agreement") is entered into as of September 21, 2009, by and among Square 1 Bank ("Bank") and AbsolutelyNew, Inc. and AbsolutelyNew Holdings, Inc. (collectively, "Borrower").

## RECITALS

Borrower wishes to obtain credit from time to time from Bank, and Bank desires to extend credit to Borrower. This Agreement sets forth the terms on which Bank will advance credit to Borrower, and Borrower will repay the amounts owing to Bank.

## AGREEMENT

The parties agree as follows:

### 1. DEFINITIONS AND CONSTRUCTION.

**1.1** **Definitions.** As used in this Agreement, all capitalized terms shall have the definitions set forth on Exhibit A. Any term used in the Code and not defined herein shall have the meaning given to the term in the Code.

**1.2** **Accounting Terms.** Any accounting term not specifically defined on Exhibit A shall be construed in accordance with GAAP and all calculations shall be made in accordance with GAAP (except for non-compliance with FAS 123R in monthly reporting). The term "financial statements" shall include the accompanying notes and schedules.

### 2. LOAN AND TERMS OF PAYMENT.

#### 2.1 Credit Extensions.

**(a)** **Promise to Pay.** Borrower promises to pay to Bank, in lawful money of the United States of America, the aggregate unpaid principal amount of all Credit Extensions made by Bank to Borrower, together with interest on the unpaid principal amount of such Credit Extensions at rates in accordance with the terms hereof.

**(b)** **Advances Under Formula Revolving Line.**

**(i)** **Amount.** Subject to and upon the terms and conditions of this Agreement, Borrower may request Formula Advances and Purchase Order Advances in an aggregate outstanding principal amount not to exceed the lesser of: (A) the Formula Revolving Line; or (B) the Formula Borrowing Base plus the Purchase Order Borrowing Base. Amounts borrowed pursuant to this Section 2.1(b) may be repaid and reborrowed at any time prior to the Formula Revolving Maturity Date, at which time all Formula Advances and Purchase Order Advances made under this Section 2.1(b) shall be immediately due and payable. Borrower may prepay any Formula Advances and Purchase Order Advances without penalty or premium. Formula Advances and Purchase Order Advances shall be used by Borrower to finance the cost of fulfilling Purchase Orders and to support Borrower's general working capital needs.

AbsolutelyNew LSA v5-final                                    1.

Exhibit "1"                                                   16

**(ii)    Form of Request.**    Whenever Borrower desires a Formula Advance or a Purchase Order Advance, Borrower will notify Bank by facsimile transmission, telephone or email no later than 5:30 p.m. Eastern time (4:30 p.m. Eastern time for wire transfers), on the Business Day that the Formula Advance or Purchase Order Advance is to be made.    Each such notification shall be promptly confirmed by a Loan Advance/Paydown Request Form in substantially the form of Exhibit C. Bank is authorized to make Formula Advances and Purchase Order Advances under this Agreement, based upon instructions received from an Authorized Officer, or without instructions if in Bank's discretion such Formula Advances and Purchase Order Advances are necessary to meet Obligations which have become due and remain unpaid. Bank shall be entitled to rely on any telephonic or email notice given by a person whom Bank reasonably believes to be an Authorized Officer or a designee thereof, and Borrower shall indemnify and hold Bank harmless for any damages, loss, costs and expenses suffered by Bank as a result of such reliance.  Bank will credit the amount of Formula Advances and Purchase Order Advances made under this Section 2.1(b) to Borrower's deposit account.

**(iii)P    urchase Order Sublimit.** Subject to the availability under the Formula Revolving Line, and further subject to and upon the terms and conditions of this Agreement, Borrower may request Purchase Order Advances in an aggregate outstanding principal amount not to exceed the Purchase Order Sublimit.

(c)    **Advances Under Non-Formula Line.**

**(i)    Amount.** Subject to and upon the terms and conditions of this Agreement, Borrower hereby requests, as of the Closing Date, a Non-Formula Advance in a principal amount equal to the Non-Formula Line. All Non-Formula Advances made under this Section 2.1(c) shall be immediately due and payable on the the Non-Formula Maturity Date. No additional Non-Formula Advances shall be made after the Closing Date. Subject to Borrower's compliance with Section 6.7(b) hereof, Borrower may prepay any Non-Formula Advances without penalty or premium; however, once repaid, Non-Formula Advances may not be reborrowed. Non-Formula Advances shall be made solely for the purpose of funding the Restricted Account as required pursuant to Section 6.7(b) hereof.

**(ii)    Form of Request.** Borrower hereby notifies Bank that a Non-Formula Advance in an amount equal to the full amount of the Non-Formula Line is requested to be made on the Closing Date. Such notification shall be promptly confirmed on the Closing Date by a Loan Advance/Paydown Request Form in substantially the form of Exhibit C, which shall be delivered to Bank. Bank is authorized to make additional Non-Formula Advances under this Agreement, based upon instructions received from an Authorized Officer, or without instructions if in Bank's discretion such Advances are necessary to meet Obligations which have become due and remain unpaid. Bank shall be entitled to rely on any telephonic or email notice given by a person whom Bank reasonably believes to be an Authorized Officer or a designee thereof, and Borrower shall indemnify and hold Bank harmless for any damages, loss, costs and expenses suffered by Bank as a result of such reliance. Bank will credit the amount of Non-Formula Advances made under this Section 2.1(c) to the Restricted Account.

AbsolutelyNew LSA v5-final                    2.

Exhibit "1"                    17

**2.2      Overadvances.** If the aggregate amount of the outstanding Formula Advances and Purchase Order Advances exceeds the lesser of the Formula Revolving Line or the Borrowing Base at any time, Borrower shall immediately pay to Bank, in cash, the amount of such excess. If the aggregate amount of the outstanding Non-Formula Advances exceeds the Non-Formula Formula Line at any time, Borrower shall immediately pay to Bank, in cash, the amount of such excess.

**2.3      Interest Rates, Payments, and Calculations.**

(a)      **Interest Rates.**

(i)      **Formula Line Advances.** Except as set forth in Section 2.3(b), the Formula Advances shall bear interest, on the outstanding daily balance thereof, at a variable annual rate equal to the greater of: (A) 4.00% above the Prime Rate then in effect; or (B) 7.25%; provided however, that after the Borrower delivers written evidence to Bank that Borrower has received the New Equity required by Section 6.7(c) hereof in its entirety, except as set forth in Section 2.3(b), the Formula Advances shall bear interest, on the outstanding daily balance thereof, at a variable annual rate equal to the greater of: (A) 3.00% above the Prime Rate then in effect; or (B) 7.25%.

(ii)      **Purchase Order Advances.** Except as set forth in Section 2.3(b), the Purchase Order Advances shall bear interest, on the outstanding daily balance thereof, at a variable annual rate equal to the greater of: (A) 5.00% above the Prime Rate then in effect; or (B) 8.25%; provided however, that after the Borrower delivers written evidence to Bank that Borrower has received the New Equity required by Section 6.7(c) hereof in its entirety, except as set forth in Section 2.3(b), the Purchase Order Advances shall bear interest, on the outstanding daily balance thereof, at a variable annual rate equal to the greater of: (A) 4.00% above the Prime Rate then in effect; or (B) 8.25%.

(iii)Non-      **Formula Line Advances.** Except as set forth in Section 2.3(b), the Non-Formula Advances shall bear interest, on the outstanding daily balance thereof, at a variable annual rate equal to the greater of: (A) 5.00% above the Prime Rate then in effect; or (B) 8.25%.

(b)      **Late Fee; Default Rate.** If any payment is not made within 15 days after the date such payment is due, Borrower shall pay Bank a late fee equal to the lesser of (i) 5% of the amount of such unpaid amount or (ii) the maximum amount permitted to be charged under applicable law. All Obligations shall bear interest, from and after the occurrence and during the continuance of an Event of Default, at a rate equal to 5 percentage points above the interest rate applicable immediately prior to the occurrence of the Event of Default.

(c)      **Payments.** Interest under the Formula Revolving Line and the Non-Formula Line shall be due and payable on the first calendar day of each month during the term hereof. Bank shall, at its option, charge such interest, all Bank Expenses, and all Periodic Payments against any of Borrower's deposit accounts or against the Formula Revolving Line or the Non-Formula Line, in which case those amounts shall thereafter accrue interest at the rate then applicable hereunder. Any interest not paid when due shall be compounded by becoming a

AbsolutelyNew LSA v5-final                    3.

Exhibit "1"                              18

part of the Obligations, and such interest shall thereafter accrue interest at the rate then applicable hereunder.

               **(d)**    **Computation.** In the event the Prime Rate is changed from time to time hereafter, the applicable rate of interest hereunder shall be increased or decreased, effective as of the day the Prime Rate is changed, by an amount equal to such change in the Prime Rate. All interest chargeable under the Loan Documents shall be computed on the basis of a 360 day year for the actual number of days elapsed.

        **2.4**    **Crediting Payments.** Prior to the occurrence of an Event of Default, Bank shall credit a wire transfer of funds, check or other item of payment to such deposit account or Obligation as Borrower specifies. After the occurrence and during the continuance of an Event of Default, Bank shall have the right, in its sole discretion, to immediately apply any wire transfer of funds, check, or other item of payment Bank may receive to conditionally reduce Obligations, but such applications of funds shall not be considered a payment on account unless such payment is of immediately available federal funds or unless and until such check or other item of payment is honored when presented for payment. Notwithstanding anything to the contrary contained herein, any wire transfer or payment received by Bank after 5:30 p.m. Eastern time shall be deemed to have been received by Bank as of the opening of business on the immediately following Business Day. Whenever any payment to Bank under the Loan Documents would otherwise be due (except by reason of acceleration) on a date that is not a Business Day, such payment shall instead be due on the next Business Day, and additional fees or interest, as the case may be, shall accrue and be payable for the period of such extension.

        **2.5**    **Fees.** Borrower shall pay to Bank the following:

               **(a)**    **Facility Fee.** On or before the Closing Date, a fee equal to $6,850, which shall be nonrefundable;

               **(b)**    **Bank Expenses.** On the Closing Date, all Bank Expenses incurred through the Closing Date, and, after the Closing Date, all Bank Expenses, as and when they become due.

        **2.6**    **Term.** This Agreement shall become effective on the Closing Date and, subject to Section 12.7, shall continue in full force and effect for so long as any Obligations remain outstanding or Bank has any obligation to make Credit Extensions under this Agreement. Notwithstanding the foregoing, Bank shall have the right to terminate its obligation to make Credit Extensions under this Agreement immediately and without notice upon the occurrence and during the continuance of an Event of Default.

**3.**    **CONDITIONS OF LOANS.**

        **3.1**    **Conditions Precedent to Closing.** The agreement of Bank to enter into this Agreement on the Closing Date is subject to the condition precedent that Bank shall have received, in form and substance satisfactory to Bank, each the following items and completed each of the following requirements:

               **(a)**    this Agreement;

AbsolutelyNew LSA v5-final        4.

square 1 bank

(b) an officer's certificate of Borrower with respect to incumbency and resolutions authorizing the execution and delivery of this Agreement;

(c) a financing statement (Form UCC-1);

(d) an intellectual property security agreement;

(e) payment of the fees and Bank Expenses then due specified in Section 2.5, which may be debited from any of Borrower's accounts with Bank;

(f) current SOS Reports indicating that except for Permitted Liens, there are no other security interests or Liens of record in the Collateral;

(g) a subordination agreement in form and substance acceptable to Bank and fully-executed by Artiman Ventures II Affiliates Fund, L.P., Artiman Ventures II Principals Fund, a Delaware Multiple Series L.L.C., and Artiman Ventures II, L.P. (collectively, "Artiman");

(h) current financial statements, including audited statements (or such other level required by the Investment Agreement) for Borrower's most recently ended fiscal year, together with an unqualified opinion (or an opinion qualified only for going concern so long as Borrower's investors provide additional equity as needed), company prepared consolidated and consolidating balance sheets and income statements for the most recently ended month in accordance with Section 6.2, and such other updated financial information as Bank may reasonably request;

(i) current Compliance Certificate in accordance with Section 6.2;

(j) a Warrant in form and substance satisfactory to Bank;

(k) a Borrower Information Certificate;

(l) Borrower shall have opened and funded not less than $10,000 in deposit accounts held with Bank;

(m) evidence acceptable to Bank that Borrower's tax liability relating to IP&R, LLC is of a nature and amount acceptable to Bank;

(n) evidence acceptable to Bank that Borrower received, after August 20, 2009 and on or before August 31, 2009, Subordinated Debt from Artiman Ventures in an amount of not less than $500,000; and

(o) such other documents or certificates, and completion of such other matters, as Bank may reasonably request.

**3.2 Conditions Precedent to all Credit Extensions.** The obligation of Bank to make each Credit Extension, including the initial Credit Extension, is contingent upon

the Borrower's compliance with Section 3.1 above, and is further subject to the following conditions:

(a)     timely receipt by Bank of the Loan Advance/Paydown Request Form as provided in Section 2.1;

(b)     Borrower shall have transferred substantially all of its Cash assets into operating accounts held with Bank and otherwise be in compliance with Section 6.6 hereof;

(c)     prior to the making of any Formula Advances, but not required prior to the making of any Purchase Order Advances or Non-Formula Advances, an audit of the Collateral, the results of which shall be satisfactory to Bank; and

(d)     the representations and warranties contained in Section 5 shall be true and correct in all material respects on and as of the date of such Loan Advance/Paydown Request Form and on the effective date of each Credit Extension as though made at and as of each such date, and no Event of Default shall have occurred and be continuing, or would exist after giving effect to such Credit Extension (provided, however, that those representations and warranties expressly referring to another date shall be true, correct and complete in all material respects as of such date). The making of each Credit Extension shall be deemed to be a representation and warranty by Borrower on the date of such Credit Extension as to the accuracy of the facts referred to in this Section 3.2.

## 4.     CREATION OF SECURITY INTEREST.

4.1     **Grant of Security Interest.** Borrower grants and pledges to Bank a continuing security interest in the Collateral to secure prompt repayment of any and all Obligations and to secure prompt performance by Borrower of each of its covenants and duties under the Loan Documents. Except for Permitted Liens or as disclosed in the Schedule, such security interest constitutes a valid, first priority security interest in the presently existing Collateral, and will constitute a valid, first priority security interest in later-acquired Collateral. Borrower also hereby agrees not to sell, transfer, assign, mortgage, pledge, lease, grant a security interest in, or encumber any of its Intellectual Property Collateral. Notwithstanding any termination of this Agreement or of any filings undertaken related to Bank's rights under the Code, Bank's Lien on the Collateral shall remain in effect for so long as any Obligations are outstanding.

4.2     **Perfection of Security Interest.** Borrower authorizes Bank to file at any time financing statements, continuation statements, and amendments thereto that (i) either specifically describe the Collateral or describe the Collateral as all assets of Borrower of the kind pledged hereunder, and (ii) contain any other information required by the Code for the sufficiency of filing office acceptance of any financing statement, continuation statement, or amendment, including whether Borrower is an organization, the type of organization and any organizational identification number issued to Borrower, if applicable. Borrower shall have possession of the Collateral, except where expressly otherwise provided in this Agreement or where Bank chooses to perfect its security interest by possession in addition to the filing of a

square 1 bank

financing statement. Where Collateral is in possession of a third party bailee, Borrower shall take such steps as Bank reasonably requests for Bank to (i) subject to Section 7.10 below, obtain an acknowledgment, in form and substance satisfactory to Bank, of the bailee that the bailee holds such Collateral for the benefit of Bank, and (ii) obtain "control" of any Collateral consisting of investment property, deposit accounts, letter-of-credit rights or electronic chattel paper (as such items and the term "control" are defined in Revised Article 9 of the Code) by causing the securities intermediary or depositary institution or issuing bank to execute a control agreement in form and substance satisfactory to Bank. Borrower will not create any chattel paper without placing a legend on the chattel paper acceptable to Bank indicating that Bank has a security interest in the chattel paper. Borrower from time to time may deposit with Bank specific cash collateral to secure specific Obligations; Borrower authorizes Bank to hold such specific balances in pledge and to decline to honor any drafts thereon or any request by Borrower or any other Person to pay or otherwise transfer any part of such balances for so long as the specific Obligations are outstanding. Borrower shall take such other actions as Bank requests to perfect its security interests granted under this Agreement.

## 5.    REPRESENTATIONS AND WARRANTIES.

Borrower represents and warrants as follows:

**5.1    Due Organization and Qualification.** Borrower and each Subsidiary is a corporation duly existing under the laws of the state in which it is organized and qualified and licensed to do business in any state in which the conduct of its business or its ownership of property requires that it be so qualified, except where the failure to do so would not reasonably be expected to cause a Material Adverse Effect.

**5.2    Due Authorization; No Conflict.** The execution, delivery, and performance of the Loan Documents are within Borrower's powers, have been duly authorized, and are not in conflict with nor constitute a breach of any provision contained in Borrower's Articles of Incorporation or Bylaws, nor will they constitute an event of default under any material agreement by which Borrower is bound. Borrower is not in default under any agreement by which it is bound, except to the extent such default would not reasonably be expected to cause a Material Adverse Effect.

**5.3    Collateral.** Borrower has rights in or the power to transfer the Collateral, and its title to the Collateral is free and clear of Liens, adverse claims, and restrictions on transfer or pledge except for Permitted Liens. Other than movable items of personal property such as laptop computers, all Collateral having an aggregate book value not in excess of $100,000, is located solely in the Collateral State. The Eligible Accounts are bona fide existing obligations. The property or services giving rise to such Eligible Accounts has been delivered or rendered to the account debtor or its agent for immediate shipment to and unconditional acceptance by the account debtor. Borrower has not received notice of actual or imminent Insolvency Proceeding of any account debtor whose accounts are included in any Borrowing Base Certificate as an Eligible Account. All Inventory is in all material respects of good and merchantable quality, free from all material defects, except for Inventory for which adequate reserves have been made. Except as set forth in the Schedule, none of the Borrower's Cash is maintained or invested with a Person other than Bank or Bank's affiliates.

Exhibit "1"                    22

**5.4** **Intellectual Property Collateral.** Borrower is the sole owner of the Intellectual Property Collateral, except for licenses granted by Borrower to its customers in the ordinary course of business. To the best of Borrower's knowledge, each of the Copyrights, Trademarks and Patents is valid and enforceable, and no part of the Intellectual Property Collateral has been judged invalid or unenforceable, in whole or in part, and no claim has been made to Borrower that any part of the Intellectual Property Collateral violates the rights of any third party except to the extent such claim would not reasonably be expected to cause a Material Adverse Effect.

**5.5** **Name; Location of Chief Executive Office.** Except as disclosed in the Schedule, Borrower has not done business under any name other than that specified on the signature page hereof, and its exact legal name is as set forth in the first paragraph of this Agreement. The chief executive office of Borrower is located at the address indicated in Section 10 hereof.

**5.6** **Litigation.** Except as set forth in the Schedule, there are no actions or proceedings pending by or against Borrower or any Subsidiary before any court or administrative agency in which a likely adverse decision would reasonably be expected to have a Material Adverse Effect.

**5.7** **No Material Adverse Change in Financial Statements.** All consolidated and consolidating financial statements related to Borrower and any Subsidiary that are delivered by Borrower to Bank fairly present in all material respects Borrower's consolidated and consolidating financial condition as of the date thereof and Borrower's consolidated and consolidating results of operations for the period then ended. There has not been a material adverse change in the consolidated or in the consolidating financial condition of Borrower since the date of the most recent of such financial statements submitted to Bank.

**5.8** **Solvency, Payment of Debts.** Borrower is able to pay its debts (including trade debts) as they mature; the fair saleable value of Borrower's assets (including goodwill minus disposition costs) exceeds the fair value of its liabilities; and Borrower is not left with unreasonably small capital after the transactions contemplated by this Agreement.

**5.9** **Compliance with Laws and Regulations.** Borrower and each Subsidiary have met the minimum funding requirements of ERISA with respect to any employee benefit plans subject to ERISA. No event has occurred resulting from Borrower's failure to comply with ERISA that is reasonably likely to result in Borrower's incurring any liability that could have a Material Adverse Effect. Borrower is not an "investment company" or a company "controlled" by an "investment company" within the meaning of the Investment Company Act of 1940. Borrower is not engaged principally, or as one of its important activities, in the business of extending credit for the purpose of purchasing or carrying margin stock (within the meaning of Regulations T and U of the Board of Governors of the Federal Reserve System). Borrower has not violated any statutes, laws, ordinances or rules applicable to it, the violation of which would reasonably be expected to have a Material Adverse Effect. Borrower and each Subsidiary have filed or caused to be filed all tax returns required to be filed, and have paid, or have made adequate provision for the payment of, all taxes reflected therein except those being contested in

good faith with adequate reserves under GAAP or where the failure to file such returns or pay such taxes would not reasonably be expected to have a Material Adverse Effect.

      5.10    **Subsidiaries**. Borrower does not own any stock, partnership interest or other equity securities of any Person, except for Permitted Investments.

      5.11    **Government Consents**. Borrower and each Subsidiary have obtained all consents, approvals and authorizations of, made all declarations or filings with, and given all notices to, all governmental authorities that are necessary for the continued operation of Borrower's business as currently conducted, except where the failure to do so would not reasonably be expected to cause a Material Adverse Effect.

      5.12    **Inbound Licenses**. Except as disclosed on the Schedule, Borrower is not a party to, nor is bound by, any material license or other agreement important for the conduct of Borrower's business that prohibits or otherwise restricts Borrower from granting a security interest in Borrower's interest in such license or agreement or any other property important for the conduct of Borrower's business, other than this Agreement or the other Loan Documents.

      5.13    **Full Disclosure**. No representation, warranty or other statement made by Borrower in any certificate or written statement furnished to Bank taken together with all such certificates and written statements furnished to Bank contains any untrue statement of a material fact or omits to state a material fact necessary in order to make the statements contained in such certificates or statements not misleading in light of the circumstances in which they were made, it being recognized by Bank that the projections and forecasts provided by Borrower in good faith and based upon reasonable assumptions are not to be viewed as facts and that actual results during the period or periods covered by any such projections and forecasts may differ from the projected or forecasted results.

## 6.    AFFIRMATIVE COVENANTS.

Borrower covenants that, until payment in full of all outstanding Obligations, and for so long as Bank may have any commitment to make a Credit Extension hereunder, Borrower shall do all of the following:

      6.1    **Good Standing and Government Compliance**. Borrower shall maintain its and each of its Subsidiaries' corporate existence and good standing in the respective states of formation, shall maintain qualification and good standing in each other jurisdiction in which the failure to so qualify would reasonably be expected to have a Material Adverse Effect, and shall furnish to Bank the organizational identification number issued to Borrower by the authorities of the state in which Borrower is organized, if applicable. Borrower shall meet, and shall cause each Subsidiary to meet, the minimum funding requirements of ERISA with respect to any employee benefit plans subject to ERISA. Borrower shall comply, and shall cause each Subsidiary to comply, with all statutes, laws, ordinances and government rules and regulations to which it is subject, and shall maintain, and shall cause each of its Subsidiaries to maintain, in force all licenses, approvals and agreements, the loss of which or failure to comply with which would reasonably be expected to have a Material Adverse Effect.

     **6.2**     **Financial Statements, Reports, Certificates**. Borrower shall deliver to Bank: (i) as soon as available, but in any event within 30 days after the end of each calendar month, a company prepared consolidated and consolidating balance sheet and income statement covering Borrower's operations during such period, in a form reasonably acceptable to Bank and certified by a Responsible Officer; (ii) as soon as available, but in any event within 180 days after the end of Borrower's fiscal year, audited (or such other level as is required by the Borrower's board of directors) consolidated and consolidating financial statements of Borrower prepared in accordance with GAAP, consistently applied, together with an opinion which is either unqualified, qualified only for going concern so long as Borrower's investors provide additional equity as needed or otherwise consented to in writing by Bank on such financial statements of an independent certified public accounting firm reasonably acceptable to Bank, provided however, that for fiscal year 2008 only, the aforementioned financial statements and accompanying opinion shall be due on or before December 31, 2009; (iii) annual budget approved by Borrower's Board of Directors as soon as available but not later than 60 days after the beginning of the applicable fiscal year; (iv) if applicable, copies of all statements, reports and notices sent or made available generally by Borrower to its security holders or to any holders of Subordinated Debt and all reports on Forms 10-K and 10-Q filed with the Securities and Exchange Commission; (v) promptly upon receipt of notice thereof, a report of any legal actions pending or threatened against Borrower or any Subsidiary that could reasonably be expected to result in damages or costs to Borrower or any Subsidiary of $250,000 or more; (vi) promptly upon receipt, each management letter prepared by Borrower's independent certified public accounting firm regarding Borrower's management control systems, (vii) such budgets, sales projections, operating plans or other financial information generally prepared by Borrower in the ordinary course of business as Bank may reasonably request from time to time; and (viii) within 30 days of the last day of each fiscal quarter, a report signed by Borrower, in form reasonably acceptable to Bank, listing any applications or registrations that Borrower has made or filed in respect of any Patents, Copyrights or Trademarks and the status of any outstanding applications or registrations, as well as any material change in Borrower's Intellectual Property Collateral, including but not limited to any subsequent ownership right of Borrower in or to any Trademark, Patent or Copyright not specified in Exhibits A, B, and C of any Intellectual Property Security Agreement delivered to Bank by Borrower in connection with this Agreement.

     **(a)**     Within 30 days after the last day of each month, Borrower shall deliver to Bank a Borrowing Base Certificate signed by a Responsible Officer in substantially the form of Exhibit D hereto, together with (i) aged listings by invoice date of accounts receivable and accounts payable, and (ii) a schedule of Purchase Orders with Inventory cost breakdown.

     **(b)**     Within 30 days after the last day of each month, Borrower shall deliver to Bank with the monthly financial statements a Compliance Certificate certified as of the last day of the applicable month and signed by a Responsible Officer in substantially the form of Exhibit E hereto.

     **(c)**     As soon as possible and in any event within 3 calendar days after becoming aware of the occurrence or existence of an Event of Default hereunder, a written statement of a Responsible Officer setting forth details of the Event of Default, and the action which Borrower has taken or proposes to take with respect thereto.

square 1 bank

(d)     Bank (through any of its officers, employees, or agents) shall have the right, upon reasonable prior notice, from time to time during Borrower's usual business hours to inspect Borrower's Books and to make copies thereof and to check, test, inspect, audit and appraise the Collateral (a "Collateral Audit") at Borrower's expense in order to verify Borrower's financial condition or the amount, condition of, or any other matter relating to, the Collateral. The frequency of Collateral Audits shall be determined by Bank.

Borrower may deliver to Bank on an electronic basis any certificates, reports or information required pursuant to this Section 6.2, and Bank shall be entitled to rely on the information contained in the electronic files, provided that Bank in good faith believes that the files were delivered by a Responsible Officer. Borrower shall include a submission date on any certificates and reports to be delivered electronically.

6.3     **Inventory and Equipment; Returns**. Borrower shall keep all Inventory and Equipment in good and merchantable condition, free from all material defects except for Inventory and Equipment (i) sold in the ordinary course of business, and (ii) for which adequate reserves have been made, in all cases in the United States and such other locations as to which Borrower gives prior written notice. Returns and allowances, if any, as between Borrower and its account debtors shall be on the same basis and in accordance with the usual customary practices of Borrower, as they exist on the Closing Date. Borrower shall promptly notify Bank of all returns and recoveries and of all disputes and claims involving inventory having a book value of more than $100,000.

6.4     **Taxes**. Borrower shall make, and cause each Subsidiary to make, due and timely payment or deposit of all material federal, state, and local taxes, assessments, or contributions required of it by law, including, but not limited to, those laws concerning income taxes, F.I.C.A., F.U.T.A. and state disability, and will execute and deliver to Bank, on demand, proof satisfactory to Bank indicating that Borrower or a Subsidiary has made such payments or deposits and any appropriate certificates attesting to the payment or deposit thereof; provided that Borrower or a Subsidiary need not make any payment if the amount or validity of such payment is contested in good faith by appropriate proceedings and is reserved against (to the extent required by GAAP) by Borrower or such Subsidiary.

6.5     **Insurance**. Borrower, at its expense, shall (i) keep the Collateral insured against loss or damage, and (ii) maintain liability and other insurance, in each case in as ordinarily insured against by other owners in businesses similar to Borrower's. All such policies of insurance shall be in such form, with such companies, and in such amounts as reasonably satisfactory to Bank. All policies of property insurance shall contain a lender's loss payable endorsement, in a form satisfactory to Bank, showing Bank as an additional loss payee, and all liability insurance policies shall show Bank as an additional insured and specify that the insurer must give at least 20 days notice to Bank before canceling its policy for any reason. Within 30 days of the Closing Date, Borrower shall cause to be furnished to Bank a copy of its policies or certificate of insurance including any endorsements covering Bank or showing Bank as an additional insured. Upon Bank's request, Borrower shall deliver to Bank certified copies of the policies of insurance and evidence of all premium payments. Proceeds payable under any casualty policy will, at Borrower's option, be payable to Borrower to replace the property subject to the claim, provided that any such replacement property shall be deemed Collateral in which

square 1 bank

Bank has been granted a first priority security interest, provided that if an Event of Default has occurred and is continuing, all proceeds payable under any such policy shall, at Bank's option, be payable to Bank to be applied on account of the Obligations.

      6.6    **"Primary Depository".** Subject to the provisions of Section 3.1(l) and 3.2(b), Borrower within 30 days of the Closing Date shall maintain all its depository and operating accounts with Bank and its primary investment accounts with Bank or Bank's affiliates.

      6.7    **Financial Covenants.** Beginning with the month ending on March 31, 2010 and all times thereafter, Borrower shall maintain the financial ratios and covenants set forth in subsections 6.7(a) and 6.7(c) below, provided however, that the covenant set forth in subsection 6.7(b) below shall be maintained beginning on the Closing Date and at all times thereafter:

      **(a)**    **Liquidity Ratio.** Measured at least monthly and applicable at all times, a Liquidity Ratio of at least 1.50 to 1.00.

      **(b)**    **Restricted Account.** A balance on deposit in the Restricted Account of not less than the aggregate of all amounts then currently owed by Borrower relating to the CEDD Lien and the WE Lien.

      **(c)**    **New Equity Milestone.** Receipt by Borrower on or before March 31, 2010 of at least $7,000,000 of New Equity from investors acceptable to Bank (which shall include Artiman Ventures).

      6.8    **Registration of Intellectual Property Rights.**

      **(a)**    Borrower shall promptly give Bank written notice of any applications or registrations of intellectual property rights filed with the United States Patent and Trademark Office, including the date of such filing and the registration or application numbers, if any.

      **(b)**    Borrower shall (i) give Bank not less than 30 days prior written notice of the filing of any applications or registrations with the United States Copyright Office, including the title of such intellectual property rights to be registered, as such title will appear on such applications or registrations, and the date such applications or registrations will be filed; (ii) prior to the filing of any such applications or registrations, execute such documents as Bank may reasonably request for Bank to maintain its perfection in such intellectual property rights to be registered by Borrower; (iii) upon the request of Bank, either deliver to Bank or file such documents simultaneously with the filing of any such applications or registrations; (iv) upon filing any such applications or registrations, promptly provide Bank with a copy of such applications or registrations together with any exhibits, evidence of the filing of any documents requested by Bank to be filed for Bank to maintain the perfection and priority of its security interest in such intellectual property rights, and the date of such filing.

(c)     Borrower shall execute and deliver such additional instruments and documents from time to time as Bank shall reasonably request to perfect and maintain the perfection and priority of Bank's security interest in the Intellectual Property Collateral.

(d)     Borrower shall (i) protect, defend and maintain the validity and enforceability of the trade secrets, Trademarks, Patents and Copyrights, (ii) use commercially reasonable efforts to detect infringements of the Trademarks, Patents and Copyrights and promptly advise Bank in writing of material infringements detected and (iii) not allow any material Trademarks, Patents or Copyrights to be abandoned, forfeited or dedicated to the public without the written consent of Bank, which shall not be unreasonably withheld.

(e)     Bank shall have the right, but not the obligation, to take, at Borrower's sole expense, any actions that Borrower is required under this Section 6.8 to take but which Borrower fails to take, after 15 days' notice to Borrower. Borrower shall reimburse and indemnify Bank for all reasonable costs and reasonable expenses incurred in the reasonable exercise of its rights under this Section 6.8.

**6.9     Consent of Inbound Licensors.** Prior to entering into or becoming bound by any material inbound license or agreement, Borrower shall: (i) provide written notice to Bank of the material terms of such license or agreement with a description of its likely impact on Borrower's business or financial condition; and (ii) in good faith use commercially reasonable efforts to obtain the consent of, or waiver by, any person whose consent or waiver is necessary for Borrower's interest in such licenses or contract rights to be deemed Collateral and for Bank to have a security interest in it that might otherwise be restricted by the terms of the applicable license or agreement, whether now existing or entered into in the future, provided, however, that the failure to obtain any such consent or waiver shall not constitute a default under this Agreement.

**6.10     Further Assurances.** At any time and from time to time Borrower shall execute and deliver such further instruments and take such further action as may reasonably be requested by Bank to effect the purposes of this Agreement.

## 7.     NEGATIVE COVENANTS.

Borrower covenants and agrees that, so long as any credit hereunder shall be available and until the outstanding Obligations are paid in full or for so long as Bank may have any commitment to make any Credit Extensions, Borrower will not do any of the following without Bank's prior written consent, which shall not be unreasonably withheld:

**7.1     Dispositions.** Convey, sell, lease, license, transfer or otherwise dispose of (collectively, to "Transfer"), or permit any of its Subsidiaries to Transfer, all or any part of its business or property, or move cash balances on deposit with Bank to accounts opened at another financial institution, other than Permitted Transfers.

**7.2     Change in Name, Location, Executive Office, or Executive Management; Change in Business; Change in Fiscal Year; Change in Control.** Change its name or the state of Borrower's formation or relocate its chief executive office without 30 days prior written notification to Bank; replace or suffer the departure of its chief executive officer or

AbsolutelyNew LSA v5-final                 13.

Exhibit "1"                 28

chief financial officer without delivering written notification to Bank within 10 days; fail to appoint an interim replacement or fill a vacancy in the position of chief executive officer or chief financial officer for more than 30 consecutive days; take action to liquidate, wind up, or otherwise cease to conduct business in the ordinary course; engage in any business, or permit any of its Subsidiaries to engage in any business, other than or reasonably related or incidental to the businesses currently engaged in by Borrower; change its fiscal year end; have a Change in Control.

**7.3** **Mergers or Acquisitions.** Merge or consolidate, or permit any of its Subsidiaries to merge or consolidate, with or into any other business organization (other than mergers or consolidations of a Subsidiary into another Subsidiary or into Borrower), or acquire, or permit any of its Subsidiaries to acquire, all or substantially all of the capital stock or property of another Person except where (a) each of the following conditions is applicable: (i) the consideration paid in connection with such transactions (including assumption of liabilities) does not in the aggregate exceed $250,000 during any fiscal year, (ii) no Event of Default has occurred, is continuing or would exist after giving effect to such transactions, (iii) such transactions do not result in a Change in Control, and (iv) Borrower is the surviving entity; or (b) the Obligations are repaid in full concurrently with the closing of any merger or consolidation of Borrower in which Borrower is not the surviving entity; provided, however, that Borrower shall not, without Bank's prior written consent, enter into any binding contractual arrangement with any Person to attempt to facilitate a merger or acquisition of Borrower; provided however, Borrower may enter into any such agreement without Bank's prior written consent so long as (i) no Event of Default exists when such agreement is entered into by Borrower, (ii) such agreement does not give such Person the right to claim any fee, payment or damages from any parties, other than from Borrower or Borrower's investors, in connection with a sale of Borrower's stock or assets pursuant to or resulting from an assignment for the benefit of creditors, an asset turnover to Borrower's creditors (including, without limitation, Bank), foreclosure, bankruptcy or similar liquidation, and (iii) Borrower notifies Bank in advance of entering into such an agreement (provided, the failure to give such notification shall not be deemed a material breach of this Agreement).

**7.4** **Indebtedness.** Create, incur, assume, guarantee or be or remain liable with respect to any Indebtedness, or permit any Subsidiary so to do, other than Permitted Indebtedness, or prepay any Indebtedness or take any actions which impose on Borrower an obligation to prepay any Indebtedness, except Indebtedness to Bank.

**7.5** **Encumbrances.** Create, incur, assume or allow any Lien with respect to its property, or assign or otherwise convey any right to receive income, including the sale of any Accounts, or permit any of its Subsidiaries so to do, except for Permitted Liens, or covenant to any other Person (other than (i) the licensors of in-licensed property with respect to such property or (ii) the lessors of specific equipment or lenders financing specific equipment with respect to such leased or financed equipment) that Borrower in the future will refrain from creating, incurring, assuming or allowing any Lien with respect to any of Borrower's property.

**7.6** **Distributions.** Pay any dividends or make any other distribution or payment on account of or in redemption, retirement or purchase of any capital stock, except that Borrower may (i) repurchase the stock of former employees pursuant to stock repurchase

square 1 bank

AbsolutelyNew LSA v5-final                    14.

agreements as long as an Event of Default does not exist prior to such repurchase or would not exist after giving effect to such repurchase, and (ii) repurchase the stock of former employees pursuant to stock repurchase agreements by the cancellation of indebtedness owed by such former employees to Borrower regardless of whether an Event of Default exists.

**7.7    Investments.**  Directly or indirectly acquire or own, or make any Investment in or to any Person, or permit any of its Subsidiaries so to do, other than Permitted Investments, or maintain or invest any of its Investment Property with a Person other than Bank or Bank's Affiliates or permit any Subsidiary to do so unless such Person has entered into a control agreement with Bank, in form and substance satisfactory to Bank, or suffer or permit any Subsidiary to be a party to, or be bound by, an agreement that restricts such Subsidiary from paying dividends or otherwise distributing property to Borrower.

**7.8    Transactions with Affiliates.**  Directly or indirectly enter into or permit to exist any material transaction with any Affiliate of Borrower except for transactions that are in the ordinary course of Borrower's business, upon fair and reasonable terms that are no less favorable to Borrower than would be obtained in an arm's length transaction with a non-affiliated Person.

**7.9    Subordinated Debt.**  Make any payment in respect of any Subordinated Debt, or permit any of its Subsidiaries to make any such payment, except in compliance with the terms of such Subordinated Debt, or amend any provision affecting Bank's rights contained in any documentation relating to the Subordinated Debt without Bank's prior written consent.

**7.10    Inventory and Equipment.**  Store the Inventory or the Equipment of a book value in excess of $100,000 with a bailee, warehouseman, collocation facility or similar third party unless the third party has been notified of Bank's security interest and Bank (a) has received an acknowledgment from the third party that it is holding or will hold the Inventory or Equipment for Bank's benefit or (b) is in possession of the warehouse receipt, where negotiable, covering such Inventory or Equipment.  Except for Inventory sold in the ordinary course of business and for movable items of personal property having an aggregate book value not in excess of $100,000, and except for such other locations as Bank may approve in writing, Borrower shall keep the Inventory and Equipment only at the location set forth in Section 10 and such other locations of which Borrower gives Bank prior written notice and as to which Bank is able to take such actions as may be necessary to perfect its security interest or to obtain a bailee's acknowledgment of Bank's rights in the Collateral.

**7.11    No Investment Company; Margin Regulation.**  Become or be controlled by an "investment company," within the meaning of the Investment Company Act of 1940, or become principally engaged in, or undertake as one of its important activities, the business of extending credit for the purpose of purchasing or carrying margin stock, or use the proceeds of any Credit Extension for such purpose.

**8.    EVENTS OF DEFAULT.**

Any one or more of the following events shall constitute an Event of Default by Borrower under this Agreement:

Exhibit "1"                                                  30

**8.1**     **Payment Default**. If Borrower fails to pay any of the Obligations when due;

**8.2**     **Covenant Default**.

(a)     If Borrower fails to perform any obligation under Sections 6.2 (financial reporting), 6.4 (taxes), 6.5 (insurance), 6.6 (primary accounts) or 6.7 (financial covenants), or violates any of the covenants contained in Article 7 of this Agreement; or

(b)     If Borrower fails or neglects to perform or observe any other material term, provision, condition, covenant contained in this Agreement, in any of the Loan Documents, or in any other present or future agreement between Borrower and Bank and as to any default under such other term, provision, condition or covenant that can be cured, has failed to cure such default within 10 days after Borrower receives notice thereof or any officer of Borrower becomes aware thereof; provided, however, that if the default cannot by its nature be cured within the 10 day period or cannot after diligent attempts by Borrower be cured within such 10 day period, and such default is likely to be cured within a reasonable time, then Borrower shall have an additional reasonable period (which shall not in any case exceed 30 days) to attempt to cure such default, and within such reasonable time period the failure to have cured such default shall not be deemed an Event of Default but no Credit Extensions will be made.

**8.3**     **Material Adverse Change**. If there occurs any circumstance or any circumstances which would reasonably be expected to have a Material Adverse Effect;

**8.4**     **Attachment**. If any material portion of Borrower's assets is attached, seized, subjected to a writ or distress warrant, or is levied upon, or comes into the possession of any trustee, receiver or person acting in a similar capacity and such attachment, seizure, writ or distress warrant or levy has not been removed, discharged or rescinded within 10 days, or if Borrower is enjoined, restrained, or in any way prevented by court order from continuing to conduct all or any material part of its business affairs, or if a judgment or other claim becomes a lien or encumbrance upon any material portion of Borrower's assets, or if a notice of lien, levy, or assessment is filed of record with respect to any material portion of Borrower's assets by the United States Government, or any department, agency, or instrumentality thereof, or by any state, county, municipal, or governmental agency, and the same is not paid within ten days after Borrower receives notice thereof, provided that none of the foregoing shall constitute an Event of Default where such action or event is stayed or an adequate bond has been posted pending a good faith contest by Borrower (provided that no Credit Extensions will be made during such cure period);

**8.5**     **Insolvency**. If Borrower becomes insolvent, or if an Insolvency Proceeding is commenced by Borrower, or if an Insolvency Proceeding is commenced against Borrower and is not dismissed or stayed within 30 days (provided that no Credit Extensions will be made prior to the dismissal of such Insolvency Proceeding);

**8.6**     **Other Agreements**. If there is a default or other failure to perform in any agreement to which Borrower is a party with a third party or parties resulting in a right by such third party or parties, whether or not exercised, to accelerate the maturity of any

square 1 bank

Exhibit "1"                                                                    31

Indebtedness in an amount in excess of $50,000 or that would reasonably be expected to have a Material Adverse Effect;

**8.7    Judgments.** If a final, uninsured judgment or judgments for the payment of money in an amount, individually or in the aggregate, of at least $50,000 shall be rendered against Borrower and shall remain unsatisfied and unstayed for a period of 10 days (provided that no Credit Extensions will be made prior to the satisfaction or stay of the judgment); or

**8.8    Misrepresentations.** If any material misrepresentation or material misstatement exists now or hereafter in any warranty or representation set forth herein or in any certificate delivered to Bank by any Responsible Officer pursuant to this Agreement or to induce Bank to enter into this Agreement or any other Loan Document.

## 9.    BANK'S RIGHTS AND REMEDIES.

**9.1    Rights and Remedies.** Upon the occurrence and during the continuance of an Event of Default, Bank may, at its election, without notice of its election and without demand, do any one or more of the following, all of which are authorized by Borrower:

(a)    Declare all Obligations, whether evidenced by this Agreement, by any of the other Loan Documents, or otherwise, immediately due and payable (provided that upon the occurrence of an Event of Default described in Section 8.5 (insolvency), all Obligations shall become immediately due and payable without any action by Bank);

(b)    Demand that Borrower (i) deposit cash with Bank in an amount equal to the amount of any Letters of Credit remaining undrawn, as collateral security for the repayment of any future drawings under such Letters of Credit, and (ii) pay in advance all Letter of Credit fees scheduled to be paid or payable over the remaining term of the Letters of Credit, and Borrower shall promptly deposit and pay such amounts;

(c)    Cease advancing money or extending credit to or for the benefit of Borrower under this Agreement or under any other agreement between Borrower and Bank;

(d)    Settle or adjust disputes and claims directly with account debtors for amounts, upon terms and in whatever order that Bank reasonably considers advisable;

(e)    Make such payments and do such acts as Bank considers necessary or reasonable to protect its security interest in the Collateral. Borrower agrees to assemble the Collateral if Bank so requires, and to make the Collateral available to Bank as Bank may designate. Borrower authorizes Bank to enter the premises where the Collateral is located, to take and maintain possession of the Collateral, or any part of it, and to pay, purchase, contest, or compromise any encumbrance, charge, or lien which in Bank's determination appears to be prior or superior to its security interest and to pay all expenses incurred in connection therewith. With respect to any of Borrower's owned premises, Borrower hereby grants Bank a license to enter into possession of such premises and to occupy the same, without charge, in order to exercise any of Bank's rights or remedies provided herein, at law, in equity, or otherwise;

**(f)** Set off and apply to the Obligations any and all (i) balances and deposits of Borrower held by Bank, and (ii) indebtedness at any time owing to or for the credit or the account of Borrower held by Bank;

**(g)** Ship, reclaim, recover, store, finish, maintain, repair, prepare for sale, advertise for sale, and sell (in the manner provided for herein) the Collateral. Bank is hereby granted a license or other right, solely pursuant to the provisions of this Section 9.1, to use, without charge, Borrower's labels, patents, copyrights, rights of use of any name, trade secrets, trade names, trademarks, service marks, and advertising matter, or any property of a similar nature, as it pertains to the Collateral, in completing production of, advertising for sale, and selling any Collateral and, in connection with Bank's exercise of its rights under this Section 9.1, Borrower's rights under all licenses and all franchise agreements shall inure to Bank's benefit;

**(h)** Sell the Collateral at either a public or private sale, or both, by way of one or more contracts or transactions, for cash or on terms, in such manner and at such places (including Borrower's premises) as Bank determines is commercially reasonable, and apply any proceeds to the Obligations in whatever manner or order Bank deems appropriate. Bank may sell the Collateral without giving any warranties as to the Collateral. Bank may specifically disclaim any warranties of title or the like. This procedure will not be considered adversely to affect the commercial reasonableness of any sale of the Collateral. If Bank sells any of the Collateral upon credit, Borrower will be credited only with payments actually made by the purchaser, received by Bank, and applied to the indebtedness of the purchaser. If the purchaser fails to pay for the Collateral, Bank may resell the Collateral and Borrower shall be credited with the proceeds of the sale;

**(i)** Bank may credit bid and purchase at any public sale;

**(j)** Apply for the appointment of a receiver, trustee, liquidator or conservator of the Collateral, without notice and without regard to the adequacy of the security for the Obligations and without regard to the solvency of Borrower, any guarantor or any other Person liable for any of the Obligations; and

**(k)** Any deficiency that exists after disposition of the Collateral as provided above will be paid immediately by Borrower.

Bank may comply with any applicable state or federal law requirements in connection with a disposition of the Collateral and compliance will not be considered adversely to affect the commercial reasonableness of any sale of the Collateral.

**9.2** **Power of Attorney**. Effective only upon the occurrence and during the continuance of an Event of Default, Borrower hereby irrevocably appoints Bank (and any of Bank's designated officers, or employees) as Borrower's true and lawful attorney to: (a) send requests for verification of Accounts or notify account debtors of Bank's security interest in the Accounts; (b) endorse Borrower's name on any checks or other forms of payment or security that may come into Bank's possession; (c) sign Borrower's name on any invoice or bill of lading relating to any Account, drafts against account debtors, schedules and assignments of Accounts,

square 1 bank

Exhibit "1"                                    33

verifications of Accounts, and notices to account debtors; (d) dispose of any Collateral; (e) make, settle, and adjust all claims under and decisions with respect to Borrower's policies of insurance; (f) settle and adjust disputes and claims respecting the accounts directly with account debtors, for amounts and upon terms which Bank determines to be reasonable; (g) enter into a short-form intellectual property security agreement consistent with the terms of this Agreement for recording purposes only or modify, in its sole discretion, any intellectual property security agreement entered into between Borrower and Bank without first obtaining Borrower's approval of or signature to such modification by amending Exhibits A, B, and C, thereof, as appropriate, to include reference to any right, title or interest in any Copyrights, Patents or Trademarks acquired by Borrower after the execution hereof or to delete any reference to any right, title or interest in any Copyrights, Patents or Trademarks in which Borrower no longer has or claims to have any right, title or interest; and (h) file, in its sole discretion, one or more financing or continuation statements and amendments thereto, relative to any of the Collateral; provided Bank may exercise such power of attorney to sign the name of Borrower on any of the documents described in clauses (g) and (h) above, regardless of whether an Event of Default has occurred. The appointment of Bank as Borrower's attorney in fact, and each and every one of Bank's rights and powers, being coupled with an interest, is irrevocable until all of the Obligations have been fully repaid and performed and Bank's obligation to provide advances hereunder is terminated.

**9.3 Accounts Collection.** At any time after the occurrence and during the continuation of an Event of Default, Bank may notify any Person owing funds to Borrower of Bank's security interest in such funds and verify the amount of such Account. Borrower shall collect all amounts owing to Borrower for Bank, receive in trust all payments as Bank's trustee, and immediately deliver such payments to Bank in their original form as received from the account debtor, with proper endorsements for deposit.

**9.4 Bank Expenses.** If Borrower fails to pay any amounts or furnish any required proof of payment due to third persons or entities, as required under the terms of this Agreement, then Bank may do any or all of the following after reasonable notice to Borrower: (a) make payment of the same or any part thereof; and/or (b) set up such reserves under the Formula Revolving Line as Bank deems necessary to protect Bank from the exposure created by such failure; or (c) obtain and maintain insurance policies of the type discussed in Section 6.5 of this Agreement, and take any action with respect to such policies as Bank deems prudent. Any amounts so paid or deposited by Bank shall constitute Bank Expenses, shall be immediately due and payable, and shall bear interest at the then applicable rate hereinabove provided, and shall be secured by the Collateral. Any payments made by Bank shall not constitute an agreement by Bank to make similar payments in the future or a waiver by Bank of any Event of Default under this Agreement.

**9.5 Bank's Liability for Collateral.** Bank has no obligation to clean up or otherwise prepare the Collateral for sale. All risk of loss, damage or destruction of the Collateral shall be borne by Borrower.

**9.6 No Obligation to Pursue Others.** Bank has no obligation to attempt to satisfy the Obligations by collecting them from any other person liable for them and Bank may release, modify or waive any collateral provided by any other Person to secure any of the

AbsolutelyNew LSA v5-final                    19.

The parties hereto may change the address at which they are to receive notices hereunder, by notice in writing in the foregoing manner given to the other.

## 11.    CHOICE OF LAW AND VENUE; JURY TRIAL WAIVER.

This Agreement shall be governed by, and construed in accordance with, the internal laws of the State of California, without regard to principles of conflicts of law. Jurisdiction shall lie in the State of California. All disputes, controversies, claims, actions and similar proceedings arising with respect to Borrower's account or any related agreement or transaction shall be brought in the Superior Court of San Mateo County, California or the United States District Court for the Northern District of California, except as provided below with respect to arbitration of such matters. BANK AND BORROWER EACH ACKNOWLEDGE THAT THE RIGHT TO TRIAL BY JURY IS A CONSTITUTIONAL ONE, BUT THAT IT MAY BE WAIVED. EACH OF THEM, AFTER CONSULTING OR HAVING HAD THE OPPORTUNITY TO CONSULT, WITH COUNSEL OF THEIR CHOICE, KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES ANY RIGHT ANY OF THEM MAY HAVE TO A TRIAL BY JURY IN ANY LITIGATION BASED UPON OR ARISING OUT OF THIS AGREEMENT OR ANY RELATED INSTRUMENT OR LOAN DOCUMENT OR ANY OF THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT OR ANY COURSE OF CONDUCT, DEALING, STATEMENTS (WHETHER ORAL OR WRITTEN), OR ACTION OF ANY OF THEM. THESE PROVISIONS SHALL NOT BE DEEMED TO HAVE BEEN MODIFIED IN ANY RESPECT OR RELINQUISHED BY BANK OR BORROWER, EXCEPT BY A WRITTEN INSTRUMENT EXECUTED BY EACH OF THEM. If the jury waiver set forth in this Section 11 is not enforceable, then any dispute, controversy, claim, action or similar proceeding arising out of or relating to this Agreement, the Loan Documents or any of the transactions contemplated therein shall be settled by final and binding arbitration held in San Mateo County, California in accordance with the then current Commercial Arbitration Rules of the American Arbitration Association by one arbitrator appointed in accordance with those rules. The arbitrator shall apply California law to the resolution of any dispute, without reference to rules of conflicts of law or rules of statutory arbitration. Judgment upon any award resulting from arbitration may be entered into and enforced by any state or federal court having jurisdiction thereof. Notwithstanding the foregoing, the parties may apply to any court of competent jurisdiction for preliminary or interim equitable relief, or to compel arbitration in accordance with this Section. The costs and expenses of the arbitration, including without limitation, the arbitrator's fees and expert witness fees, and reasonable attorneys' fees, incurred by the parties to the arbitration may be awarded to the prevailing party, in the discretion of the arbitrator, or may be apportioned between the parties in any manner deemed appropriate by the arbitrator. Unless and until the arbitrator decides that one party is to pay for all (or a share) of such costs and expenses, both parties shall share equally in the payment of the arbitrator's fees as and when billed by the arbitrator.

## 12.    GENERAL PROVISIONS.

12.1    **Successors and Assigns.** This Agreement shall bind and inure to the benefit of the respective successors and permitted assigns of each of the parties and shall bind all persons who become bound as a debtor to this Agreement; provided, however, that neither this Agreement nor any rights hereunder may be assigned by Borrower without Bank's prior written

AbsolutelyNew LSA v5-final                    21.

Exhibit "1"                    35

Obligations, all without affecting Bank's rights against Borrower. Borrower waives any right it may have to require Bank to pursue any other Person for any of the Obligations.

**9.7     Remedies Cumulative.**   Bank's rights and remedies under this Agreement, the Loan Documents, and all other agreements shall be cumulative. Bank shall have all other rights and remedies not inconsistent herewith as provided under the Code, by law, or in equity. No exercise by Bank of one right or remedy shall be deemed an election, and no waiver by Bank of any Event of Default on Borrower's part shall be deemed a continuing waiver. No delay by Bank shall constitute a waiver, election, or acquiescence by it. No waiver by Bank shall be effective unless made in a written document signed on behalf of Bank and then shall be effective only in the specific instance and for the specific purpose for which it was given. Borrower expressly agrees that this Section 9.7 may not be waived or modified by Bank by course of performance, conduct, estoppel or otherwise.

**9.8     Demand; Protest.**   Except as otherwise provided in this Agreement, Borrower waives demand, protest, notice of protest, notice of default or dishonor, notice of payment and nonpayment and any other notices relating to the Obligations.

**10.     NOTICES.**

Unless otherwise provided in this Agreement, all notices or demands by any party relating to this Agreement or any other agreement entered into in connection herewith shall be in writing and (except for financial statements and other informational documents which may be sent by first-class mail, postage prepaid) shall be personally delivered or sent by a recognized overnight delivery service, certified mail, postage prepaid, return receipt requested, or by telefacsimile to Borrower or to Bank, as the case may be, at its addresses set forth below:

| If to Borrower: | AbsolutelyNew, Inc.<br>650 Townsend Street, Suite 475<br>San Francisco, CA 94103 |
|---|---|
| | Attn:  Richard Donat<br>FAX:  (415) 865-6204 |
| If to Bank: | Square 1 Bank<br>406 Blackwell Street, Suite 240<br>Durham, North Carolina 27701<br>Attn: Loan Operations Manager<br>FAX:  (919) 314-3080 |
| with a copy to: | Square 1 Bank<br>1950 University Ave., Suite 150<br>East Palo Alto, CA 94303 |
| | Attn:  Kevin Conway<br>FAX:  (650) 243-2780 |

square 1 bank

AbsolutelyNew LSA v5-final                    20.

consent, which consent may be granted or withheld in Bank's sole discretion. Bank shall have the right without the consent of or notice to Borrower to sell, assign, transfer, negotiate, or grant participation in all or any part of, or any interest in, Bank's obligations, rights and benefits hereunder.

       **12.2**    **Indemnification.** Borrower shall defend, indemnify and hold harmless Bank and its officers, employees, and agents against: (a) all obligations, demands, claims, and liabilities claimed or asserted by any other party in connection with the transactions contemplated by this Agreement; and (b) all losses or Bank Expenses in any way suffered, incurred, or paid by Bank, its officers, employees and agents as a result of or in any way arising out of, following, or consequential to transactions between Bank and Borrower whether under this Agreement, or otherwise (including without limitation reasonable attorneys fees and expenses), except for losses caused by Bank's gross negligence or willful misconduct.

       **12.3**    **Time of Essence.** Time is of the essence for the performance of all obligations set forth in this Agreement.

       **12.4**    **Severability of Provisions.** Each provision of this Agreement shall be severable from every other provision of this Agreement for the purpose of determining the legal enforceability of any specific provision.

       **12.5**    **Amendments in Writing, Integration.** All amendments to or terminations of this Agreement or the other Loan Documents must be in writing. All prior agreements, understandings, representations, warranties, and negotiations between the parties hereto with respect to the subject matter of this Agreement and the other Loan Documents, if any, are merged into this Agreement and the Loan Documents.

       **12.6**    **Counterparts.** This Agreement may be executed in any number of counterparts and by different parties on separate counterparts, each of which, when executed and delivered, shall be deemed to be an original, and all of which, when taken together, shall constitute but one and the same Agreement. Executed copies of the signature pages of this Agreement sent by facsimile or transmitted electronically in Portable Document Format ("PDF"), or any similar format, shall be treated as originals, fully binding and with full legal force and effect, and the parties waive any rights they may have to object to such treatment.

       **12.7**    **Survival.** All covenants, representations and warranties made in this Agreement shall continue in full force and effect so long as any Obligations remain outstanding or Bank has any obligation to make any Credit Extension to Borrower. The obligations of Borrower to indemnify Bank with respect to the expenses, damages, losses, costs and liabilities described in Section 12.2 shall survive until all applicable statute of limitations periods with respect to actions that may be brought against Bank have run.

       **12.8**    **Confidentiality.** In handling any confidential information, Bank and all employees and agents of Bank shall exercise the same degree of care that Bank exercises with respect to its own proprietary information of the same types to maintain the confidentiality of any non-public information thereby received or received pursuant to this Agreement except that disclosure of such information may be made (i) to the subsidiaries or Affiliates of Bank or

Borrower in connection with their present or prospective business relations with Borrower, (ii) to prospective transferees or purchasers of any interest in the Credit Extensions, provided that they have entered into a comparable confidentiality agreement in favor of Borrower and have delivered a copy to Borrower, (iii) as required by law, regulations, rule or order, subpoena, judicial order or similar order, (iv) as may be required in connection with the examination, audit or similar investigation of Bank and (v) as Bank may determine in connection with the enforcement of any remedies hereunder. Confidential information hereunder shall not include information that either: (a) is in the public domain or in the knowledge or possession of Bank when disclosed to Bank, or becomes part of the public domain after disclosure to Bank through no fault of Bank; or (b) is disclosed to Bank by a third party, provided Bank does not have actual knowledge that such third party is prohibited from disclosing such information.

\*\*\*\*\*\*\*\*

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first above written.

ABSOLUTELYNEW, INC.

By: _____

Title: _CEO_____

ABSOLUTELYNEW HOLDINGS, INC.

By: _____

Title: _CEO_____

SQUARE 1 BANK

By: _____

Title: _SVP_____

Exhibit "1"                                    39

## EXHIBIT A

DEFINITIONS

"Accounts" means all presently existing and hereafter arising accounts, contract rights, payment intangibles and all other forms of obligations owing to Borrower arising out of the sale or lease of goods (including, without limitation, the licensing of software and other technology) or the rendering of services by Borrower and any and all credit insurance, guaranties, and other security therefore, as well as all merchandise returned to or reclaimed by Borrower and Borrower's Books relating to any of the foregoing.

"Advance" or "Advances" means Formula Advances, Non-Formula Advances and Purchase Order Advances.

"Affiliate" means, with respect to any Person, any Person that owns or controls directly or indirectly such Person, any Person that controls or is controlled by or is under common control with such Person, and each of such Person's senior executive officers, directors, and general partners.

"Authorized Officer" means someone designated as such in the corporate resolution provided by Borrower to Bank in which this Agreement and the transactions contemplated hereunder are authorized by Borrower's board of directors. If Borrower provides subsequent corporate resolutions to Bank after the Closing Date, the individual(s) designated as "Authorized Officer(s)" in the most-recently provided resolution shall be the only "Authorized Officers" for purposes of this Agreement.

"Bank Expenses" means all reasonable costs or expenses (including reasonable attorneys' fees and expenses) incurred in connection with the preparation, negotiation, administration, and enforcement of the Loan Documents; reasonable Collateral audit fees; and Bank's reasonable attorneys' fees and expenses (whether generated in-house or by outside counsel) incurred in amending, enforcing or defending the Loan Documents (including fees and expenses of appeal), incurred before, during and after an Insolvency Proceeding, whether or not suit is brought.

"Borrower's Books" means all of Borrower's books and records including: ledgers; records concerning Borrower's assets or liabilities, the Collateral, business operations or financial condition; and all computer programs, or tape files, and the equipment, containing such information.

"Business Day" means any day that is not a Saturday, Sunday, or other day on which banks in the State of North Carolina are authorized or required to close.

"CEDD Lien" means a Lien against Borrower in favor of the California Employment Development Department in an amount of approximately $298,270.14 as of January 31, 2009, together with such interest, penalties and other fees or related charges as may accrue in relation thereto thereafter.

"Cash" means unrestricted cash and cash equivalents.

"Change in Control" shall mean a transaction other than a bona fide equity financing or series of financings on terms and from investors reasonably acceptable to Bank in which any "person" or "group" (within the meaning of Section 13(d) and 14(d)(2) of the Securities Exchange Act of 1934) becomes the "beneficial owner" (as defined in Rule 13d-3 under the Securities Exchange Act of 1934), directly or indirectly, of a sufficient number of shares of all classes of stock then outstanding of Borrower ordinarily entitled to vote in the election of directors, empowering such "person" or "group" to elect a majority of the Board of Directors of Borrower, who did not have such power before such transaction.

"Closing Date" means the date of this Agreement.

1.

"Code" means the California Uniform Commercial Code as amended or supplemented from time to time.

"Collateral" means the property described on Exhibit B-1 and Exhibit B-2 attached hereto and all Negotiable Collateral and Intellectual Property Collateral to the extent not described on Exhibit B-1 and Exhibit B-2, except to the extent any such property (i) is nonassignable by its terms without the consent of the licensor thereof or another party (but only to the extent such prohibition on transfer is enforceable under applicable law, including, without limitation, §9406 and §9408 of the Code), (ii) the granting of a security interest therein is contrary to applicable law, provided that upon the cessation of any such restriction or prohibition, such property shall automatically become part of the Collateral, (iii) constitutes the capital stock of a controlled foreign corporation (as defined in the IRC), in excess of 65% of the voting power of all classes of capital stock of such controlled foreign corporations entitled to vote, or (iv) property (including any attachments, accessions or replacements) that is subject to a Lien that is permitted pursuant to clause (c) of the definition of Permitted Liens, if the grant of a security interest with respect to such property pursuant to this Agreement would be prohibited by the agreement creating such Permitted Lien or would otherwise constitute a default thereunder, provided, that such property will be deemed "Collateral" hereunder upon the termination and release of such Permitted Lien.

"Collateral State" means the state or states where the Collateral is located, which is California.

"Contingent Obligation" means, as applied to any Person, any direct or indirect liability, contingent or otherwise, of that Person with respect to (i) any indebtedness, lease, dividend, letter of credit or other obligation of another, including, without limitation, any such obligation directly or indirectly guaranteed, endorsed, co-made or discounted or sold with recourse by that Person, or in respect of which that Person is otherwise directly or indirectly liable; (ii) any obligations with respect to undrawn letters of credit, corporate credit cards or merchant services issued for the account of that Person; and (iii) all obligations arising under any interest rate, currency or commodity swap agreement, interest rate cap agreement, interest rate collar agreement, or other agreement or arrangement designated to protect a Person against fluctuation in interest rates, currency exchange rates or commodity prices; provided, however, that the term "Contingent Obligation" shall not include endorsements for collection or deposit in the ordinary course of business. The amount of any Contingent Obligation shall be deemed to be an amount equal to the stated or determined amount of the primary obligation in respect of which such Contingent Obligation is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof as determined by such Person in good faith; provided, however, that such amount shall not in any event exceed the maximum amount of the obligations under the guarantee or other support arrangement.

"Copyrights" means any and all copyright rights, copyright applications, copyright registrations and like protections in each work or authorship and derivative work thereof, whether published or unpublished and whether or not the same also constitutes a trade secret, now or hereafter existing, created, acquired or held.

"Credit Extension" means each Advance, or any other extension of credit, by Bank to or for the benefit of Borrower hereunder.

"Eligible Accounts" means those Accounts that arise in the ordinary course of Borrower's business that comply with all of Borrower's representations and warranties to Bank set forth in Section 5.3; provided, that Bank may change the Advance Rate and the standards of eligibility by giving Borrower 10 days prior written notice. Unless otherwise agreed to by Bank, Eligible Accounts shall not include the following:

        (a)    Accounts with respect to an account debtor who is a natural person;

        (b)    Account balances that the account debtor has failed to pay in full within 90 days

2.

of invoice date;

    **(c)** Account credit balances greater than 90 days from invoice date;

    **(d)** Accounts with respect to an account debtor, 25% of whose Accounts the account debtor has failed to pay within 90 days of invoice date;

    **(e)** Accounts with respect to an account debtor, including the account debtor's subsidiaries and Affiliates, whose total obligations to Borrower exceed 50% of all Accounts (excluding Accounts with respect to an account debtor who is a natural person), to the extent such obligations exceed the aforementioned percentage, except as approved in writing by Bank;

    **(f)** Accounts with respect to which the account debtor does not have its principal place of business in the United States, except for Eligible Foreign Accounts;

    **(g)** Accounts with respect to which the account debtor is the United States or any department, agency, or instrumentality of the United States, except for Accounts of the United States if the payee has assigned its payment rights to Bank and the assignment has been acknowledged under the Assignment of Claims Act of 1940 (31 U.S.C. 3727);

    **(h)** Accounts with respect to which Borrower is liable to the account debtor for goods sold or services rendered by the account debtor to Borrower, but only to the extent of any amounts owing to the account debtor against amounts owed to Borrower;

    **(i)** Accounts with respect to which the account debtor is an officer, employee, agent, Subsidiary or Affiliate of Borrower;

    **(j)** Accounts with respect to which goods are placed on consignment, guaranteed sale, sale or return, sale on approval, bill and hold, demo or promotional, or other terms by reason of which the payment by the account debtor may be conditional;

    **(k)** "Advanced Billings," i.e., accounts that have not yet been billed to the account debtor or that relate to deposits (such as good faith deposits) or other property of the account debtor held by Borrower for the performance of services or delivery of goods which Borrower has not yet performed or delivered;

    **(l)** Accounts with respect to which the account debtor disputes liability or makes any claim with respect thereto as to which Bank believes, in its sole discretion, that there may be a basis for dispute (but only to the extent of the amount subject to such dispute or claim), or is subject to any Insolvency Proceeding, or becomes insolvent, or goes out of business;

    **(m)** Accounts the collection of which Bank reasonably determines after inquiry and consultation with Borrower to be doubtful;

    **(n)** Retentions and hold-backs; and

    **(o)** "Progress Billings," i.e., accounts that are billed based on project milestones and not on actual time and materials bases.

"Eligible Foreign Accounts" means Accounts: (x) with respect to which the account debtor does not have its principal place of business in the United States; and (y) which do not otherwise fall within any of subsections

3.

Exhibit "1"      42

(a) through (d) and (f) through (n) of the definition of "Eligible Accounts", and that are: (i) supported by one or more letters of credit in an amount and of a tenor, and issued by a financial institution, acceptable to Bank, (ii) insured by the Export Import Bank of the United States, (iii) generated by an account debtor with its principal place of business in Canada, except for the Province of Quebec, or (iv) approved by Bank on a case-by-case basis. All Eligible Foreign Accounts must be calculated in U.S. Dollars, and must be billed by the Borrower from a location within the United States of America."Equipment" means all present and future machinery, equipment, tenant improvements, furniture, fixtures, vehicles, tools, parts and attachments in which Borrower has any interest.

"Equipment" means all present and future machinery, equipment, tenant improvements, furniture, fixtures, vehicles, tools, parts and attachments in which Borrower has any interest.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended, and the regulations thereunder.

"Event of Default" has the meaning assigned in Article 8.

"Formula Advance" or "Formula Advances" means a cash advance or cash advances under the Formula Revolving Line.

"Formula Borrowing Base" means an amount equal to 80.0% (the "Advance Rate") of Eligible Accounts, as determined by Bank with reference to the most recent Borrowing Base Certificate delivered by Borrower.

"Formula Revolving Line" means a Credit Extension of up to $1,000,000 (inclusive of any amounts outstanding under the Purchase Order Sublimit).

"Formula Revolving Maturity Date" means September 20, 2010.

"GAAP" means generally accepted accounting principles, consistently applied, as in effect from time to time in the United States.

"Indebtedness" means (a) all indebtedness for borrowed money or the deferred purchase price of property or services, including without limitation reimbursement and other obligations with respect to surety bonds and letters of credit, (b) all obligations evidenced by notes, bonds, debentures or similar instruments, (c) all capital lease obligations, and (d) all Contingent Obligations, including but not limited to any sublimit contained herein.

"Insolvency Proceeding" means any proceeding commenced by or against any Person or entity under any provision of the United States Bankruptcy Code, as amended, or under any other bankruptcy or insolvency law, including assignments for the benefit of creditors, formal or informal moratoria, compositions, extension generally with its creditors, or proceedings seeking reorganization, arrangement, or other relief.

"Intellectual Property Collateral" means all of Borrower's right, title, and interest in and to the following:

      (a)    Copyrights, Trademarks and Patents;

      (b)    Any and all trade secrets, and any and all intellectual property rights in computer software and computer software products now or hereafter existing, created, acquired or held;

      (c)    Any and all design rights which may be available to Borrower now or hereafter existing, created, acquired or held;

4.

square 1 bank

(d)   Any and all claims for damages by way of past, present and future infringement of any of the rights included above, with the right, but not the obligation, to sue for and collect such damages for said use or infringement of the intellectual property rights identified above;

(e)   All licenses or other rights to use any of the Copyrights, Patents or Trademarks, and all license fees and royalties arising from such use to the extent permitted by such license or rights;

(f)   All amendments, renewals and extensions of any of the Copyrights, Trademarks or Patents; and

(g)   All proceeds and products of the foregoing, including without limitation all payments under insurance or any indemnity or warranty payable in respect of any of the foregoing.

"Inventory" means all present and future inventory in which Borrower has any interest.

"Investment" means any beneficial ownership of (including stock, partnership or limited liability company interest or other securities) any Person, or any loan, advance or capital contribution to any Person.

"Investment Agreement" means, collectively, Borrower's stock purchase and other agreement(s) pursuant to which Borrower most recently issued its preferred stock.

"IRC" means the Internal Revenue Code of 1986, as amended, and the regulations thereunder.

"Letter of Credit" means a commercial or standby letter of credit or similar undertaking issued by Bank at Borrower's request.

"Lien" means any mortgage, lien, deed of trust, charge, pledge, security interest or other encumbrance.

"Liquidity" means the sum of: (i) unrestricted Cash in Bank; plus (ii) the most-recently submitted and approved Borrowing Base (excluding any portion of the Borrowing Base attributable to Purchase Orders), with the final amount of such Borrowing Base being subject to the results of the most-recent Collateral audit.

"Liquidity Ratio" means the ratio of Liquidity to all Indebtedness to Bank

"Loan Documents" means, collectively, this Agreement, any note or notes executed by Borrower, and any other document, instrument or agreement entered into in connection with this Agreement, all as amended or extended from time to time.

"Material Adverse Effect" means a material adverse effect on: (i) the operations, business or financial condition of Borrower and its Subsidiaries taken as a whole; (ii) the ability of Borrower to repay the Obligations or otherwise perform its obligations under the Loan Documents; or (iii) Borrower's interest in, or the value, perfection or priority of Bank's security interest in the Collateral.

"Negotiable Collateral" means all of Borrower's present and future letters of credit of which it is a beneficiary, drafts, instruments (including promissory notes), securities, documents of title, and chattel paper, and Borrower's Books relating to any of the foregoing.

"New Equity" means cash proceeds received after the Closing Date from the sale or issuance of Borrower's equity securities to investors acceptable to Bank (which shall include Artiman Ventures); provided however, that investments originally made in the form of Subordinated Debt shall not be construed as New Equity, even if such Subordinated Debt converts into equity securities of the Borrower.

5.

"Non-Formula Advance" or "Non-Formula Advances" means a cash advance or cash advances under the Non-Formula Line.

"Non-Formula Line" means a Credit Extension of up to $370,000.

"Non-Formula Maturity Date" means the earlier of (i) March 31, 2010; or (ii) the receipt by Bank of confirmation that Borrower has received the New Equity in its entirety pursuant to the terms of Section 6.7(c) hereof.

"Obligations" means all debt, principal, interest, Bank Expenses and other amounts owed to Bank by Borrower pursuant to this Agreement or any other agreement, whether absolute or contingent, due or to become due, now existing or hereafter arising, including any interest that accrues after the commencement of an Insolvency Proceeding and including any debt, liability, or obligation owing from Borrower to others that Bank may have obtained by assignment or otherwise.

"Patents" means all patents, patent applications and like protections including without limitation improvements, divisions, continuations, renewals, reissues, extensions and continuations-in-part of the same.

"Periodic Payments" means all installments or similar recurring payments that Borrower may now or hereafter become obligated to pay to Bank pursuant to the terms and provisions of any instrument, or agreement now or hereafter in existence between Borrower and Bank.

"Permitted Indebtedness" means:

(a)     Indebtedness of Borrower in favor of Bank arising under this Agreement or any other Loan Document;

(b)     Indebtedness existing on the Closing Date and disclosed in the Schedule;

(c)     Indebtedness not to exceed $50,000 in the aggregate in any fiscal year of Borrower secured by a lien described in clause (c) of the defined term "Permitted Liens," provided such Indebtedness does not exceed at the time it is incurred the lesser of the cost or fair market value of the property financed with such Indebtedness;

(d)     Subordinated Debt;

(e)     Indebtedness to trade creditors incurred in the ordinary course of business; and

(f)     Extensions, refinancings and renewals of any items of Permitted Indebtedness, provided that the principal amount is not increased or the terms modified to impose more burdensome terms upon Borrower or its Subsidiary, as the case may be.

"Permitted Investment" means:

(a)     Investments existing on the Closing Date disclosed in the Schedule;

(b)     (i) Marketable direct obligations issued or unconditionally guaranteed by the United States of America or any agency or any State thereof maturing within one year from the date of acquisition thereof, (ii) commercial paper maturing no more than one year from the date of creation thereof and currently having rating of at least A-2 or P-2 from either Standard & Poor's Corporation or Moody's Investors Service, (iii) Bank's certificates of deposit maturing no more than one year from the date of investment therein, and (iv) Bank's money market accounts; (v) Investments in regular deposit or checking accounts held with Bank or subject to a control agreement in favor of Bank; and (vi) Investments consistent with any investment policy adopted by the

6.

Borrower's board of directors;

(c)  Repurchases of stock from former employees or directors of Borrower under the terms of applicable repurchase agreements (i) in an aggregate amount not to exceed $50,000 in any fiscal year, provided that no Event of Default has occurred, is continuing or would exist after giving effect to the repurchases, or (ii) in any amount where the consideration for the repurchase is the cancellation of indebtedness owed by such former employees to Borrower regardless of whether an Event of Default exists;

(d)  Investments accepted in connection with Permitted Transfers;

(e)  Investments of Subsidiaries in or to other Subsidiaries or Borrower and Investments by Borrower in Subsidiaries not to exceed $50,000 in the aggregate in any fiscal year;

(f)  Investments not to exceed $50,000 outstanding in the aggregate at any time consisting of (i) travel advances and employee relocation loans and other employee loans and advances in the ordinary course of business, and (ii) loans to employees, officers or directors relating to the purchase of equity securities of Borrower or its Subsidiaries pursuant to employee stock purchase plan agreements approved by Borrower's Board of Directors;

(g)  Investments in unfinanced capital expenditures in any fiscal year, not to exceed $50,000;

(h)  Investments (including debt obligations) received in connection with the bankruptcy or reorganization of customers or suppliers and in settlement of delinquent obligations of, and other disputes with, customers or suppliers arising in the ordinary course of Borrower's business;

(i)  Investments consisting of notes receivable of, or prepaid royalties and other credit extensions, to customers and suppliers who are not Affiliates, in the ordinary course of business, provided that this subparagraph (h) shall not apply to Investments of Borrower in any Subsidiary;

(j)  Joint ventures or strategic alliances in the ordinary course of Borrower's business consisting of the non-exclusive licensing of technology, the development of technology or the providing of technical support, provided that any cash Investments by Borrower do not exceed $50,000 in the aggregate in any fiscal year; and

(k)  Investments permitted under Section 7.3.

"Permitted Liens" means the following:

(a)  Any Liens existing on the Closing Date and disclosed in the Schedule (excluding Liens to be satisfied with the proceeds of the Credit Extensions) or arising under this Agreement, the other Loan Documents, or any other agreement in favor of Bank;

(b)  Liens for taxes, fees, assessments or other governmental charges or levies, either not delinquent or being contested in good faith by appropriate proceedings and for which Borrower maintains adequate reserves;

(c)  Liens not to exceed $50,000 in the aggregate (i) upon or in any Equipment (other than Equipment financed by a Credit Extension) acquired or held by Borrower or any of its Subsidiaries to secure the purchase price of such Equipment or indebtedness incurred solely for the purpose of financing the acquisition or lease of such Equipment, or (ii) existing on such Equipment at the time of its acquisition, in each case provided that the Lien is confined solely to the property so acquired and improvements thereon, and the proceeds of such Equipment;

7.

square 1 bank

Exhibit "1"                    46

**(d)** Liens incurred in connection with the extension, renewal or refinancing of the indebtedness secured by Liens of the type described in clauses (a) through (c) above, provided that any extension, renewal or replacement Lien shall be limited to the property encumbered by the existing Lien and the principal amount of the indebtedness being extended, renewed or refinanced does not increase;

**(e)** Liens arising from judgments, decrees or attachments in circumstances not constituting an Event of Default under Sections 8.4 (attachment) or 8.7 (judgments); and

**(f)** Liens securing Subordinated Debt.

"Permitted Transfer" means the conveyance, sale, lease, transfer or disposition by Borrower or any Subsidiary of:

**(a)** Inventory in the ordinary course of business;

**(b)** licenses and similar arrangements for the use of the property of Borrower or its Subsidiaries in the ordinary course of business;

**(c)** worn-out, surplus or obsolete Equipment not financed with the proceeds of Credit Extensions;

**(d)** grants of security interests and other Liens that constitute Permitted Liens; and

**(e)** other assets of Borrower or its Subsidiaries that do not in the aggregate exceed $50,000 during any fiscal year.

"Person" means any individual, sole proprietorship, partnership, limited liability company, joint venture, trust, unincorporated organization, association, corporation, institution, public benefit corporation, firm, joint stock company, estate, entity or governmental agency.

"Prime Rate" means the variable rate of interest, per annum, most recently announced by Bank, as its "prime rate," whether or not such announced rate is the lowest rate available from Bank.

"Purchase Order Advance" or "Purchase Order Advances" means a cash advance or cash advances under the Purchase Order Sublimit of the Formula Revolving Line.

"Purchase Order Borrowing Base" means an amount equal to 100.0% (the "Purchase Order Advance Rate") of Inventory cost associated with fulfillment of Purchase Orders, as determined by Bank with reference to the most recent Borrowing Base Certificate delivered by Borrower.

"Purchase Order" or "Purchase Orders" means a signed, written authorization(s) (in form and substance acceptable to Bank) that is delivered by Borrower's customers to Borrower in which the Borrower is authorized by a customer to ship products at a specified price, and which becomes a legally binding contract once the Borrower accepts it.

"Purchase Order Sublimit" means a sublimit for Purchase Order Advances under the Formula Revolving Line, with Purchase Order Advances made under such sublimit not to exceed the lesser of: (i) $500,000, or (ii) the Purchase Order Borrowing Base; provided however, that after the Borrower delivers written evidence to Bank that Borrower has received the New Equity required by Section 6.7(c) hereof, Bank shall make no further Purchase Order Advances unless the Borrower achieves and maintains a conversion rate of Purchase Orders into Accounts of at least ninety percent (90.0%).

8.

square 1 bank

"Responsible Officer" means each of the Chief Executive Officer, the Chief Operating Officer, the Chief Financial Officer, Vice President of Finance and the Controller of Borrower, as well as any other officer or employee identified in as an Authorized Officer in the corporate resolution delivered by Borrower to Bank in connection with this Agreement.

"Restricted Account" means a deposit account at Bank opened by Borrower for the purpose of holding the proceeds of Non-Formula Advances to pay amounts owed relating to the CEDD Lien and the WE Lien. Borrower agrees that it may withdraw funds from this Restricted Account only with the express permission of Bank and only for the purpose of repaying amounts owed relating to the CEDD Lien and the WE Lien; provided however, that upon delivery by Borrower to Bank of evidence that any and all amounts owed relating to both the CEDD Lien and the WE Lien have been indefeasibly paid in full, Borrower may thereafter transfer any funds remaining in the Restricted Account to another account at Bank.

"Schedule" means the schedule of exceptions attached hereto and approved by Bank, if any.

"Shares" means (i) sixty-five percent (65%) of the issued and outstanding capital stock, membership units or other securities owned or held of record by Borrower in any Subsidiary of Borrower which is not an entity organized under the laws of the United States or territory thereof, and (ii) one hundred percent (100%) of the issued and outstanding capital stock, membership units or other securities owned or held of record by Borrower in any Subsidiary of Borrower which is an entity organized under the laws of the United States or any territory thereof

"SOS Reports" means the official reports from the Secretaries of State of each Collateral State, the state where Borrower's chief executive office is located, the state of Borrower's formation and other applicable federal, state or local government offices identifying all current security interests filed in the Collateral and Liens of record as of the date of such report.

"Subordinated Debt" means any debt incurred by Borrower that is subordinated in writing to the debt owing by Borrower to Bank on terms reasonably acceptable to Bank (and identified as being such by Borrower and Bank).

"Subsidiary" means any corporation, partnership or limited liability company or joint venture in which (i) any general partnership interest or (ii) more than 50% of the stock, limited liability company interest or joint venture of which by the terms thereof ordinary voting power to elect the Board of Directors, managers or trustees of the entity, at the time as of which any determination is being made, is owned by Borrower, either directly or through an Affiliate.

"Trademarks" means any trademark and servicemark rights, whether registered or not, applications to register and registrations of the same and like protections, and the entire goodwill of the business of Borrower connected with and symbolized by such trademarks.

"WE Lien" means a Lien against Borrower in favor of Worldwide Express in an amount of approximately $27,543, together with such interest, penalties and other fees or related charges as may accrue in relation thereto thereafter.

square 1 bank

9.

DEBTOR:                **ABSOLUTELYNEW, INC.**

SECURED PARTY:      **SQUARE 1 BANK**

## EXHIBIT B-1

### COLLATERAL DESCRIPTION ATTACHMENT TO LOAN AND SECURITY AGREEMENT

All personal property of Borrower (herein referred to as "Borrower" or "Debtor") whether presently existing or hereafter created or acquired, and wherever located, including, but not limited to:

(a)     all accounts (including health-care-insurance receivables), chattel paper (including tangible and electronic chattel paper), deposit accounts, documents (including negotiable documents), equipment (including all accessions and additions thereto), financial assets, general intangibles (including patents, trademarks, copyrights, goodwill, payment intangibles and software), goods (including fixtures), instruments (including promissory notes), inventory (including all goods held for sale or lease or to be furnished under a contract of service, and including returns and repossessions), investment property (including securities and securities entitlements), letter of credit rights, money, and all of Debtor's books and records with respect to any of the foregoing, and the computers and equipment containing said books and records;

(b)     any and all cash proceeds and/or noncash proceeds of any of the foregoing, including, without limitation, insurance proceeds, and all supporting obligations and the security therefor or for any right to payment. All terms above have the meanings given to them in the California Uniform Commercial Code, as amended or supplemented from time to time, including revised Division 9 of the Uniform Commercial Code-Secured Transactions.

square 1 bank

1.

**DEBTOR:** **ABSOLUTELYNEW HOLDINGS, INC.**

**SECURED PARTY:** **SQUARE 1 BANK**

### EXHIBIT B-2

### COLLATERAL DESCRIPTION ATTACHMENT TO LOAN AND SECURITY AGREEMENT

All personal property of Borrower (herein referred to as "Borrower" or "Debtor") whether presently existing or hereafter created or acquired, and wherever located, including, but not limited to:

**(c)** all accounts (including health-care-insurance receivables), chattel paper (including tangible and electronic chattel paper), deposit accounts, documents (including negotiable documents), equipment (including all accessions and additions thereto), financial assets, general intangibles (including patents, trademarks, copyrights, goodwill, payment intangibles and software), goods (including fixtures), instruments (including promissory notes), inventory (including all goods held for sale or lease or to be furnished under a contract of service, and including returns and repossessions), investment property (including securities and securities entitlements), letter of credit rights, money, and all of Debtor's books and records with respect to any of the foregoing, and the computers and equipment containing said books and records;

**(d)** any and all cash proceeds and/or noncash proceeds of any of the foregoing, including, without limitation, insurance proceeds, and all supporting obligations and the security therefor or for any right to payment. All terms above have the meanings given to them in the California Uniform Commercial Code, as amended or supplemented from time to time, including revised Division 9 of the Uniform Commercial Code-Secured Transactions.

square 1 bank

2.

Exhibit "1" 50

### EXHIBIT C

### LOAN ADVANCE/PAYDOWN REQUEST FORM

*[Please refer to New Borrower Kit]*

### EXHIBIT D
### BORROWING BASE CERTIFICATE

*[Please refer to New Borrower Kit]*

### EXHIBIT E
### COMPLIANCE CERTIFICATE

*[Please refer to New Borrower Kit]*

square 1 bank

3.

Exhibit "1"

## SCHEDULE OF EXCEPTIONS

**Permitted Indebtedness** (Exhibit A) See Permitted Liens, below.

**Permitted Investments** (Exhibit A) – None.

**Permitted Liens** (Exhibit A) – The Lien described below in favor of Artiman Ventures II Affiliates Fund, L.P., Artiman Ventures II Principals Fund, a Delaware Multiple Series L.L.C., and Artiman Ventures II, L.P. (collectively, "Artiman") is permitted by Bank subject to execution by Artiman of a subordination agreement in favor of Bank on terms and conditions agreeable to Bank. The Liens described below for the California Employment Development Department (which is the same Lien identified in the definition of CEDD Lien) and for Worldwide Express (which is the same Lien identified in the definition of WE Lien) are both permitted by Bank subject to the terms and conditions of this Agreement, including but not limited to Section 6.7(b) hereof.

| Collateral | Type | Secured Party | Debtor | Amount |
|---|---|---|---|---|
| All Inventory including proceeds and products - All Account(s) including proceeds and products- All General Intangibles(s) including proceeds and products - All Fixtures including proceeds and products - and others | Convertible Notes | Artiman Ventures II Affiliates Fund, L.P. Artiman Ventures II Principals Fund, a Delaware Multiple Series L.L.C. Artiman Ventures II, L.P. | AbsolutelyNew Holdings, Inc. | $11,000,000.00 |
| Computer Equipment - Leased Communications equipment and proceeds | Equipment Lease | CIT Communications Finance Corporation, Livingston, NJ | AbsolutelyNew, Inc. | $5,500.00 |
| All Assets | Administrative | California Employment Development Department | AbsolutelyNew, Inc. | $298,270.14 |
| All Assets | Judgment | Worldwide Express | AbsolutelyNew Holdings, Inc. | $27,542.74 |

**Prior Names** (Section 5.5) – Between May 2007 and September 2007, inclusive, AbsolutelyNew, Inc. dba Amazing Innovations.

**Litigation** (Section 5.6) – None.

**Inbound Licenses** (Section 5.12) – None.

square 1 bank

1.

## UCC FINANCING STATEMENT

FOLLOW INSTRUCTIONS (front and back) CAREFULLY

**A. NAME & PHONE OF CONTACT AT FILER [optional]**
Diligenz
(800)858-5294

**B. SEND ACKNOWLEDGMENT TO: (Name and Address)**
CORPORATION SERVICE COMPANY
6500 HARBOR HEIGHTS PKWY STE 400
MUKILTEO, WA 98275
USA

DOCUMENT NUMBER: 22426920002
FILING NUMBER: 09-7209138908
FILING DATE: 09/24/2009 14:57
IMAGE GENERATED ELECTRONICALLY FOR XML FILING
THE ABOVE SPACE IS FOR CA FILING OFFICE USE ONLY

**1. DEBTOR'S EXACT FULL LEGAL NAME** - insert only one debtor name (1a or 1b) - do not abbreviate or combine names

OR

| 1a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| ABSOLUTELYNEW, INC. | | | |

| 1b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 650 Townsend Street, Suite 475 | San Francisco | CA | 94103 | USA |

| 1d. SEE INSTRUCTIONS | ADD'L DEBTOR INFO | 1e. TYPE OF ORGANIZATION | 1f. JURISDICTION OF ORGANIZATION | 1g. ORGANIZATIONAL ID#, if any |
|---|---|---|---|---|
| | | Corporation | CA | 2436332   ☐NONE |

**2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME** - insert only one debtor name (2a or 2b) - do not abbreviate or combine names

OR

| 2a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| | | | |

| 2b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

| 2d. SEE INSTRUCTIONS | ADD'L DEBTOR INFO | 2e. TYPE OF ORGANIZATION | 2f. JURISDICTION OF ORGANIZATION | 2g. ORGANIZATIONAL ID#, if any |
|---|---|---|---|---|
| | | | | ☐NONE |

**3. SECURED PARTY'S NAME (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P)** - insert only one secured party name (3a or 3b)

OR

| 3a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| Square 1 Bank | | | |

| 3b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 406 Blackwell Street, Ste. 240 | Durham | NC | 27701 | USA |

**4. This FINANCING STATEMENT covers the following collateral:**

See Attachment(s)

**5. ALT DESIGNATION:** ☐LESSEE/LESSOR ☐CONSIGNEE/CONSIGNOR ☐BAILEE/BAILOR ☐SELLER/BUYER ☐AG. LIEN ☐NON-UCC FILING

| ☐6. This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS Attach Addendum [if applicable] | 7. Check to REQUEST SEARCH REPORT(S) on Debtor(s) [ADDITIONAL FEE]   [optional] ☐All Debtors ☐Debtor 1 ☐Debtor 2 |
|---|---|

**8. OPTIONAL FILER REFERENCE DATA**
S/S CA [45232678]

FILING OFFICE COPY

Exhibit "2"                                                                    53

**DEBTOR:**          **ABSOLUTELYNEW, INC.**

**SECURED PARTY:**          **SQUARE 1 BANK**

### EXHIBIT A

### COLLATERAL DESCRIPTION ATTACHMENT TO UCC FINANCING STATEMENT

All personal property of Borrower (herein referred to as "Borrower" or "Debtor") whether presently existing or hereafter created or acquired, and wherever located, including, but not limited to:

(a)      all accounts (including health-care-insurance receivables), chattel paper (including tangible and electronic chattel paper), deposit accounts, documents (including negotiable documents), equipment (including all accessions and additions thereto), financial assets, general intangibles (including patents, trademarks, copyrights, goodwill, payment intangibles and software), goods (including fixtures), instruments (including promissory notes), inventory (including all goods held for sale or lease or to be furnished under a contract of service, and including returns and repossessions), investment property (including securities and securities entitlements), letter of credit rights, money, and all of Debtor's books and records with respect to any of the foregoing, and the computers and equipment containing said books and records;

(b)      any and all cash proceeds and/or noncash proceeds of any of the foregoing, including, without limitation, insurance proceeds, and all supporting obligations and the security therefor or for any right to payment. All terms above have the meanings given to them in the California Uniform Commercial Code, as amended or supplemented from time to time, including revised Division 9 of the Uniform Commercial Code-Secured Transactions.