John D. O'Connor (SBN 54238)
Steven J. Garrett (SBN 221021)
O'CONNOR AND ASSOCIATES
201 Mission Street, Suite 710
San Francisco, CA 94105
Telephone: (415) 693-9960
Facsimile: (415) 692-6537

Attorney for Defendant
HENRY LO

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SQUARE 1 BANK,<br><br>                Plaintiff,<br>        vs.<br><br>HENRY LO, an individual; and ABSOLUTELY NEW, INC., a California corporation<br><br>                Defendant. | CASE NO.  C 12-05595 JSC<br><br><br>**THIRD PARTY COMPLAINT FOR EQUITABLE INDEMNITY; WRITTEN INDEMNITY; DEFAMATION; FRAUD; AND DECLARATORY RELIEF** |
| HENRY LO,<br><br>                Third Party Plaintiff,<br>        vs.<br><br>AMIT SHAH, an individual; ARTIMAN VENTURES, L.P., a California Limited Partnership; ABSOLUTELYNEW HOLDINGS, INC., a Delaware Corporation; and ABSOLUTELYNEW, INC., a California Corporation<br><br>                Third Party Defendants. | DEMAND FOR JURY TRIAL |

Third Party Plaintiff HENRY LO hereby brings the following Third Party Complaint against Third Party Defendants as follows:

## PARTIES AND JURISDICTION

1.      Third Party Plaintiff Henry Lo ("Lo") is an individual residing in the Northern District of the State of California. Lo is a defendant in the underlying action brought by Square 1 Bank.

2.      Third Party Defendant AbsolutelyNew, Inc. ("ANI") is a corporation organized under the laws of the State of California, with its principal place of business in San Francisco, California. ANI is a Co-Defendant in the underlying action. At all pertinent times herein, ANI was wholly-owned by Third Party Defendant AbsolutelyNew Holdings, Inc. ("Holdings"), and was a sister company to Inventors Promotion and Research ("IPR") (ANI and IPR collectively, "Companies" or "Company").

3.      Third Party Defendant AbsolutelyNew Holdings, Inc. ("Holdings") is a corporation organized under the laws of the State of Delaware, with its principal place of business in San Francisco, California. Holdings, at all pertinent times herein, was the parent company of Third Party Defendant ANI and IPR. Because, as alleged below, Holdings was the parent of ANI and IPR, ANI and IPR were wholly-owned subsidiaries of Holdings, and because these entities were not in fact separate entities and corporate formalities were not observed, Holdings was the alter ego of ANI and IPR.

4.      Third Party Defendant Artiman Ventures, L.P. ("Artiman") is a limited partnership organized under the laws of the State of California, with its principal place of business in Palo Alto, California. In and after April of 2007, Artiman was the controlling entity of AbsolutelyNew Holdings, Inc. ("Holdings"), and the board of Holdings was dominated and controlled by partners of Artiman. Officers and directors of Holdings were required to report to a special board of Artiman as it related to Holdings' decision making. Because, as alleged below, Artiman so treated Holdings as its own venture such that corporate separation was not achieved, and separate corporate formalities were not observed regarding the decision making of Holdings, Artiman was the alter ego of Holdings.

5.     Third Party Defendant Amit Shah ("Shah") is an individual residing in the Northern District of the State of California, and is a partner in Third Party Defendant Artiman and a director of Third Party Defendant Holdings.  Shah, at all pertinent times, was a partner in Artiman Ventures charged with the control of Holdings, which in turn was the parent of ANI, a defendant in the underlying action, and IPR, both corporations formally employing third party plaintiff Henry Lo.

6.     Third Party Defendants ANI, Holdings, Artiman and Shah shall collectively be referred to herein as "Third Party Defendants."

7.     This Third Party Complaint is brought under *Federal Rule of Civil Procedure*, rule 14, and under the doctrine of ancillary jurisdiction.

## BACKGROUND ALLEGATIONS

8.     In the underlying Complaint filed by Square 1 Bank ("Bank"), the Bank has alleged in summary and substance that Lo defrauded the Bank into providing a loan and series of credit extensions to ANI, that the loan was not repaid in full, and that as a result, the Bank suffered losses in the amount of approximately $4,400,000. Thus, the Bank makes certain claims against Lo in its own right, which are not derived from any claims procured from ANI.

9.     The underlying Complaint also claims damages brought in favor of the Bank for conversion, money had and received, implied contract, unjust enrichment and similar actions brought in the right of ANI, for the alleged misdirection and/or conversion of funds by Lo to the detriment of ANI. By virtue of its loan agreement with ANI, the Bank claims to possess ANI's claims and choses in action, and in that capacity as successor to ANI's rights, seeks additional damages from Lo. The total amount of damages for both the alleged misrepresentations to the Bank and the alleged "misdirections" regarding ANI total $4,400,000.

10.     In this Third Party Complaint, Lo claims that, to the extent that any of the Bank's claims are successful against Lo, all or part of any damage assessed against him should be borne by Third Party Defendants.

## GENERAL ALLEGATIONS

11.     Inventors Promotion and Research ("IPR") had been, up through April of 2007, a

company that had successfully generated revenue by inducing inventors of products and devices to pay IPR for its promised services of commercially promoting an inventor's invention, such that the invention generated profits for the inventor.

12. If, for example, IPR was retained by the inventor of the proverbial "better mousetrap," perhaps through IPR's efforts, the mousetrap would be funded by an investor and sold at Home Depot and/or on infomercials, to the great profit of the inventor. Typically, the inventor would have made an initial payment of $10,000 to IPR for these promotional and research services.

13. In and around October of 2006, by a stock exchange with AbsolutelyNew Holdings, Inc., IPR became a subsidiary of Holdings. At the time, Holdings also was the owner of Absolutely New, Inc. ("ANI"), Lo's Co-Defendant in the underlying Complaint. IPR's success in obtaining contracts from inventors was, to some degree, dependent upon the inventor's ability to pay through home equity lines of credit ("HELOC") or through credit card payments processed by IPR through merchant bank accounts, a PayPal account, or other credit card accounts run through the merchant bank process.

14. However, many inventors were dissatisfied with the services, or lack of same, of IPR, and sometimes requested refunds of IPR, often seeking same from the credit card companies through the merchant bank accounts, and/or complaints to various agencies and organizations scrutinizing businesses, such as the Better Business Bureau. Nonetheless, through 2006, IPR was enjoying revenues of approximately $1 million per month.

15. Lo joined IPR in 2006 after being convinced to do so by IPR president and founder Steven Barbarich. Lo saw that revenues were great but that high expenses, together with past lack of financial discipline in paying company debts, especially taxes, was keeping IPR from profitability.

16. Lo had enjoyed modest success in the past as a "turnaround" executive with other struggling mezzanine-level companies, using his financial and management expertise, and CPA skills to assist these companies, make them profitable and then sell them. In addition to his financial acumen, Lo also had sometimes contributed his own investment funds to the success of

these companies. He saw similar opportunities in IPR, as the company was described to him by Barbarich.

17. Lo later realized that he may have been recruited to IPR more for his willingness and ability to fund IPR as a credit source of last resort than for his financial and accounting skills. In fact, on many occasions, Lo saved IPR, as he became by necessity a funding source of last resort. Lo funded IPR and its successor ANI (ANI and IPR collectively, "Companies" or "Company"), on many occasions, and prevented them from closing their doors by loaning each Company funds for their payroll, lease payments and deposits, and other necessary expenses.

18. Lo was specifically promised by IPR and later by ANI, first through Barbarich and later by other upper management executives such as Richard Donat, Third Party Defendant Shah and others, that any advances Lo made to these Companies would be repaid whenever funds were available; and that Lo could pay himself without the need for further specific authorization.

19. This payment arrangement was wholly consistent with the Companies' normal and customary practices regarding informal reimbursement of executive expenses. Company accountants and controllers were instructed by upper management to cooperate in this arrangement, and specifically as to its arrangement with Lo regarding his advances, and by their continued cooperation in this arrangement, Lo continued to rely on the promises made by management that he could repay his advances and other company debts at his own discretion as CFO.

20. Lo relied upon these promises and representations in continuing to fund these Companies, and in becoming liable for payroll tax liability as a potential controlling person of the Companies, based on the understanding that he could repay himself for any liabilities assessed against him by any taxing authority. Thus, either as to funds advanced directly by Lo, or as to liabilities incurred by Lo as a result of his officer's position in the Company, Lo could rely for his security on his ability to repay himself through available funds. Based on these promises, representations, assurances and arrangements, Lo continued to fund the struggling Companies, and risked the possibility of personal tax liability for failure of any Company to timely pay its

taxes.

21.     Relying on these promises and the permission granted to informally secure his debt by unfettered access to company accounts, Lo over time advanced approximately $800,000 in payroll loans; deposited $100,000 to secure one lease, and $60,000 for another lease for the Companies, both deposits ultimately forfeited for non-payment of lease obligations by the Companies.  Lo also funded a merchant bank account in the sum of $240,000 ("Merchant Bank"), guaranteeing the Companies' obligations under the account, from which the bank often assessed liabilities by virtue of refund demands by inventors, thereby making Lo a creditor of the Companies, for just the lease deposits and Merchant Bank liabilities alone, in excess of $400,000.

22.     Both Companies experienced poor credit, were unable to open credit accounts and, therefore, part of Lo's funding role became opening accounts in his own name, including the Merchant Bank account for processing credit card payments and funding the account with his own funds, again in the amount of approximately $240,000. Lo also opened credit card accounts for the benefit of the Companies in his own name, with accompanying financial responsibly. Because these accounts were in Lo's own name, he legally possessed these accounts and also had title to the personal property represented by these accounts, which, under the *California Commercial Code*, constitutes a form of security interest in this personal property.

23.     Having such a security interest allowed Lo to seize or draw from these accounts to cure any breach or default in the Companies' obligations to him.

24.     Lo eventually left employment with the Companies in late 2009, and even after that Lo was requested by the Companies to stay on these accounts, because of the Companies' continuing credit problems. ANI continued to name Lo company Secretary, and Lo also possessed continued authority to act for IPR and ANI regarding debts and liabilities for which he might be potentially responsible and also with regard to amounts owed to Lo by the Companies. As a result of the above, Lo's continued ownership and title of these accounts, his continuing guarantee of these accounts, and promises and authorizations by the Companies, Lo was still authorized to pay himself for any liabilities owed him from the Companies through his own

discretion. It was agreed, pursuant to the above, that Lo could repay himself from these accounts in relation to any obligation that either Company owed him, or as to which he deemed himself insecure regarding potential future obligations.

25. Beginning in or around late 2006, as IPR became a subsidiary of Holdings and a sister company of ANI, the Companies began to discuss ridding itself operationally of liabilities of IPR, while transferring assets to ANI, without these IPR liabilities.

26. Thus, upper management in IPR, ANI and Holdings began discussing "Project 180," in which they considered moving all assets of IPR, including its employees, offices, software, equipment and intellectual property, to ANI, while shedding the significant liabilities of IPR. These liabilities of IPR included not only significant liabilities to vendors, but, perhaps more importantly, liabilities to the many inventors that had paid for services of IPR, services which ANI intended not to perform. These liabilities also included several millions of dollars of tax liabilities of IPR which included: liabilities of IPR when it was, in the past, totally owned as an LLC by Barbarich, and thus Barbarich also owed these taxes; tax liabilities owed by IPR, not involving Barbarich's sole ownership; and, to the extent not paid by IPR, large amounts of payroll taxes. In addition to these payroll taxes being liabilities of IPR, they were also the liabilities of other "controlling" officials, as so deemed under the law, such as Lo and Barbarich. In addition to these corporate tax liabilities of IPR as to which certain individuals may have been jointly liable, Barbarich had certain personal tax liabilities in the amount of approximately $400,000. Barbarich intended to pay these personal tax liabilities through the cash flow of the Companies.

27. One issue that upper management discussed in regards to Project 180 was whether ANI could shed the IPR liabilities by using this new company to perform IPR functions, and the related need for a legal opinion to determine whether this was possible.

28. Beginning in late 2006 through in early 2007, IPR and ANI discussed with Shah and Artiman about potential investment in the Companies, through Holdings.

29. As part of these discussions, Shah and Artiman expressed an interest in owning the great majority of shares, approximately 90%, and therefore needed Barbarich to relinquish

most of his stock and decrease his ownership in Holdings from 60% to approximately 3%. Barbarich expressed an unwillingness to be "crammed down" so significantly as part of the investment by Artiman.

30.     As part of the contentious negotiations that followed regarding the reduction of Barbarich's ownership, Barbarich insisted that the Companies pay his tax liabilities and indemnify him for other potential tax liabilities. Barbarich thus insisted that the Companies indemnify him for any tax liabilities which would be owed jointly by IPR and Barbarich, which would include joint liability from when Barbarich was the sole owner of IPR as an LLC, and as well for his more current joint liabilities with IPR as a controlling person for unpaid payroll taxes.  Barbarich also wanted to ensure that his personal tax liability would be paid, for which he would have been able to pay if he kept control of the Companies. If in fact he were to lose control of the Companies, then he insisted that the Companies promise to pay such personal tax liability. As to the more current payroll tax liability, management discussed, both internally and with Artiman and Shah, that Lo was also likely liable for such payroll taxes, along with IPR and Barbarich, since Lo was a controlling person and was responsible for payroll taxes.

31.     Accordingly, as part of the discussions and negotiation regarding Artiman's potential gaining control of the Companies, Shah and Artiman specifically promised Lo that, if Shah and Artiman did gain control of Holdings, they would pay all of Barbarich's tax liabilities, which included, in some cases, liabilities also jointly shared by Lo. These promises and representations were made directly to Lo acting both as an intermediary for Barbarich and IPR, and in his own right as an IPR executive and potential tax debtor. These promises and representations were important to the welfare of IPR because failure to pay these tax liabilities would pose an existential threat to the continuation of IPR as a business entity. Shah and Artiman represented to Lo and Barbarich, through Lo, that Lo would have the authority and power to pay these tax liabilities as needed and as required by taxing authorities. Some of these liabilities were already in collection, while other liabilities were contingent, and Lo was given authority to negotiate and pay these amounts as necessary.

32.     In reliance on the foregoing promises and representations, Barbarich agreed to

relinquish control over the Companies and, thereby Lo understood that he now had authority to pay these tax liabilities as cash permitted. Barbarich authorized Lo to act on his behalf with the taxing authorities, and Lo also was given authority as CFO of IPR to act for IPR with regard to these taxing authorities. Lo was authorized to make agreements with these authorities in his discretion and to make payments to liquidate any such tax liabilities, under agreement with the taxing authorities or otherwise. Barbarich agreed to be "crammed down" to 3% ownership of Holdings, largely on the basis of the commitment by Artiman and Shah to pay these tax liabilities as negotiated by Lo with the various taxing authorities.

33. Before Shah and Artiman invested in and took control over the Companies, they partook in detailed discussions regarding the above, including discussions directly between Shah and Lo, and possessed full knowledge of the debts of IPR, including its tax liabilities, Barbarich's personal tax liabilities, and also liabilities owed to Lo as a funding source. They also knew of and authorized Lo's authority to deal with these issues at his discretion.

34. As CFO for IPR and ANI, Lo both formally and informally kept Shah and Artiman advised of the debt structure and liabilities of IPR and also, beginning in April, 2007 of the fact that ANI would now be responsible for the debts of IPR; and of the progress of these issues regarding Project 180.

35. In an email, Shah on behalf of Artiman, ANI, Holdings, and IPR, specifically acknowledged the special "Indemnity Agreements" regarding Barbarich. Additionally, under Section 2802 of the *California Labor Code*, ANI and IPR owed a duty to their employees to indemnify them for liability incurred in the course of their employment. This obligation applies to payroll tax liabilities of a company, which an employee might become personally liable as part of his duties on behalf of the company.

36. In an email of April 20, 2007, as a way of gaining leverage against Barbarich, Shah acknowledged to Lo and others that, "Henry's commitment to the IRS is in jeopardy." This email referred to an installment agreement with the IRS for joint IPR/Barbarich tax liabilities which required Artiman funding to fulfill. Therefore, pursuant to the foregoing allegations, Shah and Artiman knew of the IPR/Barbarich tax liabilities and knew and authorized Lo to negotiate

their liquidation.

37.     At the time of this email, Artiman and Shah had not yet fully funded the planned investment in ANI and, upon making the planned funding and gaining control over ANI, Artiman and Shah were confirming their commitment to pay these tax liabilities.

38.     Many of the payments Lo subsequently made to the IRS after Artiman took control of ANI are payments as to which the Bank and ANI now say, in this litigation, were concealed and wrongfully made by Lo.  The Bank further contends that these payments now constitute debts and liabilities of IPR as to which the Bank claims to have been unaware and thus defrauded by Lo. In short, the Bank alleges that these tax liability payments, on information and belief, constitute both liabilities of which the Bank claims it was defrauded and as to which Lo misdirected payments to the detriment of ANI. These claims are false and, in fact, responsibility for these payments was acknowledged by Artiman and Shah before taking control of ANI and completing their investment therein.

39.     In February 2007, in discussion with Shah and Artiman about investing in Holdings, which in turn owned ANI and IPR, Lo presented a complete consolidated financial statement showing approximately $4,000,000 in consolidated liabilities of the Companies, virtually all from IPR. These liabilities included debts to Lo as well as the tax liabilities.

40.     Shah and Artiman were interested in investing in Holdings because of its excellent cash flow of approximately one million dollars per month, as of the end of 2006. However, Shah and Artiman wished to explore the possibility of shedding the multimillion dollars in liabilities of IPR, as had been discussed by company executives regarding Project 180. Accordingly, in March of 2007, before its final investment commitment, Shah, Artiman, Richard Donat (President of IPR), Lo, and John Campbell of Morrison and Foerster discussed the possibility of stripping all assets from IPR and transferring them to ANI, at the time essentially a shell company with little assets or activities. This transfer would potentially allow avoidance of IPR liabilities, while gaining for ANI all IPR assets. It would also potentially give ANI a good credit rating, while avoiding the effects of IPR's poor credit rating, and thereby as well avoiding the negative effects of inventor complaints, poor Better Business Bureau ratings, and other

negative publicity.

41.     Unfortunately for Shah and Artiman, its ethical and competent legal counsel advised them that this action would not allow ANI to avoid the liabilities of IPR, and that structuring ANI as proposed would be a mere continuation of IPR, carrying with it all IPR liabilities.

42.     In spite of this advice, Artiman and Shah, rather than pulling out of the investment, as it had threatened Barbarich, committed to and did invest fully in Holdings in April of 2007, giving Artiman control over Holdings and its subsidiaries ANI and IPR.

43.     In spite of the legal advice it received, after the investment by Artiman and under the direction of Shah and Artiman, Holdings and ANI attempted to disassociate ANI from IPR, in April of 2007, in order to attempt to shed liabilities of IPR.

44.     Pursuant to this plan, and under direction from Artiman, Shah and Holdings, IPR fired all of its employees on May 6, 2007, and ANI rehired these very same employees on May 7, 2007. All IPR assets were immediately transferred to ANI. The newly hired ANI employees occupied the same space, gained by virtue of a substantial cash deposit by Lo, and the same desks, using the same equipment, the same software and the same IP.  Inventors previously recruited by IPR who had not yet paid their fees were instructed to pay ANI, and ANI used IPR funds to support ANI operations. Meanwhile, inventors who had signed with IPR were abandoned by ANI, and no services were performed by ANI for these inventors.

45.     Furthermore, to this plan, IPR vendors were falsely informed by IPR and ANI that ANI was a new company not associated with IPR. Inventors' contracts entered into with IPR prior to 2007 were not honored.

46.     In spite of the above, Artiman, Shah, Holdings and ANI recognized and acknowledged internally that ANI was responsible for the debts of IPR, and specifically recognized its indemnity obligations for the various tax liabilities described in the foregoing paragraphs. Lo continued, with the authority of these entities, to discuss tax liabilities with the IRS and other tax authorities. In July, 2007, with the explicit authorization of ANI president Richard Donat, Lo began paying taxing authorities for IPR/Barbarich tax liabilities.

47.    However, pursuant to the plan of dissociation of ANI from IPR, in order to disguise that ANI was in fact paying certain IPR liabilities, Lo customarily paid this liability using cashier's checks. These payments, so clearly authorized by Shah, Artiman, Holdings, ANI and Donat, are now in the present litigation being claimed by the Bank to have be wrongfully misdirected by Lo.

48.    In September of 2007, a California taxing authority, EDD, visited the ANI premises and determined, correctly, that ANI was merely a continuation of IPR, and therefore required ANI to pay the IPR tax liabilities owed to EDD, which ANI agreed to do and placed EDD on its books as an ANI vendor.

49.    Also in September of 2007, while Barbarich was still an executive of ANI, Barbarich gave Lo power of attorney to negotiate his personal tax liabilities with the IRS, with the same IRS authorities with whom Lo had previously negotiated the joint IPR/Barbarich tax liabilities. Lo preceded to negotiate these Barbarich tax liabilities, having previously been so authorized by Artiman, Shah, Holdings, ANI and IPR.  In accordance with the program of dissociation of IPR and ANI, Lo again disguised the source of the payments to the IRS which he negotiated, although ANI and all parties knew well their provenance.

50.    That these payments for Barbarich's personal tax liabilities were authorized was confirmed by a December, 2007 email from Donat to Barbarich, copy to Shah and Lo, in which Donat confirmed that ANI would pay Barbarich's personal tax liability when it had sufficient cash. Donat was at the time the president of ANI, a director of Holdings, and reported regularly and directly to Artiman and Shah.

51.    In any case, from July, 2007, forward, Lo paid various tax liabilities of Barbarich in an approximate sum of $1.1 million. These were, in part, the allegedly "misdirected" payments made from ANI accounts and, on information and belief, constituted some of the fraud alleged by the Bank against Lo for not disclosing liabilities of ANI.  But, pursuant to the foregoing, Shah, Artiman and Holdings, as well as ANI, knew of these payments and authorized them.

52.    In and around January, 2009, ANI applied for credit with the Bank, on referral by

Artiman, with whom the Bank had an ongoing relationship. The original advance sought by ANI was around $500,000.

53. As part of this application, Lo made presentation of ANI's financial condition to the Bank, which involved a presentation of the annual 2008 consolidated financial statement of the Companies. This consolidated statement correctly referred to "$3.5 to $4.0 mm" in liabilities of IPR.

54. After the presentation by Lo, and the consideration of other information provided to the Bank, the Bank turned down the application for credit.

55. After the Bank rejected this application, Artiman, Shah, Holdings and ANI conspired to execute a fraudulent Asset Transfer Agreement ("ATA"), under final draft as of February, 2009, but backdated to April, 2007, purporting to be a legitimate, arms-length transfer of assets between IPR and ANI, which, it was hoped, would have the effect of falsely demonstrating that ANI did not assume the liabilities of IPR, but, rather, had purchased the assets appropriately.

56. Shah, Artiman, ANI and Holdings caused this ATA to be presented to the Bank as a true and correct representation of a supposed arms-length transaction. In addition, Shah, Artiman and Holdings offered the Bank stock warrants in Holdings' stock and a guarantee by Artiman of any credit extended to ANI.

57. Additionally, on information and belief, as part of the foregoing discussions, Artiman, Shah, ANI and Holdings represented to the Bank, independent of Lo, the financial conditions and prospects of ANI, the meaning of the ATA, and the lack of ANI liability for IPR debts.

58. Based upon these representations by Shah, Artiman, ANI and Holdings, the Bank granted credit to Holdings, as guaranteed by Artiman, and initially advanced approximately $500,000.

59. Accordingly, if as alleged by the Bank, in the underlying Complaint herein, there is any misrepresentation, including concealment, regarding the financial condition of Holdings, its business prospects and liabilities, in connection with the extension of credit by the Bank to

ANI, responsibility for such misrepresentation was that of Shah, Artiman, ANI, and Holdings, not Lo, such that Third Party Defendants Shah, Artiman, ANI and Holdings should share in any liability to the Bank for misrepresentation, should contribute to any award of damages to Lo, and indemnify Lo for any damages assessed; and these entities should be judged responsible should the Bank show any misrepresentation. The original grant of credit while Lo was CFO that in any way involved Lo was in the amount of $500,000. Subsequent to Lo's term as CFO, further grants of credit of approximately $4,000,000 were made and, on information and belief, came as a result of continued representations by Shah, Artiman, Holdings and ANI, and none by Lo.

60. Lo was employed as CFO of ANI and Holdings, and was as well the corporate Secretary of ANI, and was entitled to indemnity under *California Labor Code* §2802 and *California Corporations Code* §317 for liabilities he was assessed as a result of his being an employee or officer of ANI or Holdings. Additionally, in or around October 27, 2008, Holdings granted Lo by written indemnity agreement full indemnity for any judgments, expenses, costs, liabilities and attorney's fees as a result of Lo's actions on behalf of Holdings or on behalf of any subsidiaries, which would include IPR and ANI. Attached hereto as **Exhibit 1** is a true and correct copy of the October, 2008 Indemnity Agreement.

61. Accordingly, under the written indemnity agreement, as well as the statutory indemnities of *California Labor Code* §2802 and *California Corporations Code* §317, any damages assessed against Lo, as well as expenses, costs and attorney's fees as a result of this litigation, need be reimbursed to Lo by Holdings.

62. Two days after the Bank granted credit to ANI in July, 2009, Lo was removed by order of Holdings, Shah and Artiman from his CFO positions on behalf of ANI and Holdings, in an attempt to disassociate these entities from IPR and its liabilities, with which Lo was also associated. In October 2009, these entities terminated Lo from any employment. Holdings, however, continued to name Lo as corporate Secretary after his termination, and Lo was specifically asked by Holdings and ANI, with the agreement and authorization of Shah and Artiman, to continue as signatory, account holder and guarantor of the Merchant Bank and PayPal accounts, which included access to credit cards as well. These accounts were held in Lo's

name and he was the legal owner of these accounts. Prior to this time and continuing to the present, Lo understood that he had the authority and legal authorization to secure, offset and repay any debts owed him by the company from these accounts.

63.     ANI, Holdings, Shah and Artiman all knew, or should have known, that Lo was the titled owner and possessor of these accounts, that Lo was still owed money for advances, deposits and interest on same; that Lo had in effect a security interest in these accounts as a result of title to and possession of these accounts and that Lo had been previously authorized to draw from them.

64.     In spite of this knowledge, no Third Party Defendant, nor anyone else, ever took steps to withdraw Lo's authority over these accounts, or to substitute another holder and owner of these accounts. At no time did any of the parties inform Lo that he was no longer authorized to repay himself for his advances on behalf of ANI/IPR/Holdings, all made for the ultimate benefit of ANI, Holdings, Artiman and Shah, as a partner in Artiman; or that they were disclaiming any liabilities to him or a duty to indemnify.

65.     From April, 2007 continuing onward, Artiman, Shah, Holdings and ANI knew of and encouraged Lo's continued funding of the Companies, and knew and approved of financial statements showing debts to Lo.

66.     Artiman owned, on information and belief, over 90% of Holdings, and dominated and controlled Holdings, by and through Artiman and Shah, acting as a partner of Artiman; all financial decisions for Holdings were made and approved only with the approval of Artiman; these decisions were made by a committee, not of Holdings, but of Artiman, to whom management of Holdings and ANI directly reported to, and received direction from.

67.     Specifically, Lo, as an officer of Holdings, and Donat, as an officer and director of Holdings, were required to report to the committee of Artiman which controlled Holdings; the board of Holdings was dominated and controlled by partners of Artiman, and Shah, a partner of Artiman, was Chairman of the board of Holdings. Artiman so treated Holdings as its own venture such that corporate separation was not achieved, and separate corporate formalities were not observed regarding the decision making of Holdings, such that, in essence, Holdings was the

alter ego of Artiman. As such, Artiman should be held liable under the Indemnification Agreement for all costs, expenses, fees, settlements, and judgments, as provided by the Indemnity, and otherwise should be held responsible for all damages herein incurred by Lo. Because Holdings was the parent of ANI, and ANI and IPR were wholly owned subsidiaries of Holdings, and because these entities were not in fact separate entities, in fact, Holdings was the alter ego of these two entities as well.

68.     Holdings and Artiman have already breached the Indemnity Agreement by failing to inform the pertinent insurers, pursuant to Paragraph 2(d) of the Indemnity Agreement, of the pendency of this action and the need to indemnify and defend Lo, to Lo's damage. Lo has suffered damage in this regard, and may well suffer damage in the future of such costs and fees and potential settlement or judgment, for which he should have been indemnified both by Holdings and by its insurers. Lo has been damaged by the failure of Artiman to forward costs and fees and/or failure of any insurer to do so. Any judgment, settlement, fees and costs assessed against Lo should have been paid by Holdings and Artiman. Lo seeks a declaration stating that Holdings and Artiman are responsible for any amounts assessed against Lo in this action as well as any necessary costs and fees.

69.     Any liability of Lo, either to the Bank in its own right or to the Bank pursuing choses in action of ANI, would be as a result of Lo's good faith pursuit of company policy and direction of Lo by superiors ANI, Holdings, Shah and Artiman, and Lo is entitled to indemnity under the Indemnity Agreement, *California Labor Code* §2802, *California Corporations Code* §317 and otherwise. Lo seeks a declaration of this court that he is entitled to indemnity as provided by agreement and/or statute.

70.     If there is in fact any fraud or misrepresentation of the Bank, or misdirection or other misuse of funds of ANI as alleged, such as the result of Lo's good faith compliance with Third Party Defendants' policies and directions as Lo's corporate superiors, then Third Party Defendants are otherwise co-tortfeasors with Lo, as to which Lo seeks implied and express indemnity.

71.     If Lo is found responsible for tortious or wrongful conduct, such liability is

entirely or partially the fault of Third Party Defendants. Therefore Lo seeks damages as to each Third Party Defendant to reimburse him fully or partially for damage assessed herein.

72. Third Party Defendants are also responsible for the defamation here alleged, to Lo's general reputational damage and other specific damage, including costs and expenses of defending this lawsuit. To wit, on information and belief, beginning in or around April, 2011, ANI, Shah, Artiman and Holdings transmitted various oral and written communications to the Bank and unknown others, stating in essence that Lo had defrauded the Bank by concealing liabilities, and that Lo had misdirected approximately $1.7 million in ANI funds, and that he had no authority to make the payments at issue. These statements continued until a time unknown and were false and defamatory. Lo prays leave to insert the precise statements after discovery reveals them.

73. Third Party Defendants have also tortiously interfered by defamation, fraud and false statement, and by inducing breach of contract, in the contractual relations of Lo with ANI, his employer, and have induced ANI to breach, both anticipatorily and actually, its contractual promises to Lo, including promises to repay Lo for advances made by Lo personally to and for the benefit of the company, as well as promises to indemnify and repay him for tax liabilities as a controlling person pursuing his duties as an employee and officer of ANI and IPR.

74. As of the date of this Third Party Complaint, Lo may be liable, vicariously as a result of the Companies' nonpayment of taxes for approximately $1.3 million owed to various taxing authorities. Artiman, as the _alter ego_ of Holdings, the owner and parent of ANI and IPR, refused to pay lawfully due taxes, and participated in fraud on these governmental taxing authorities - Federal, State and local - by denying falsely the identity and successor/predecessor relationship of IPR and ANI. As a result, Lo now has been left to face these potential liabilities, without any payments by Third Party Defendants or by an indemnity by the entities. Lo therefore seeks a Declaration from this Court that any tax assessment or payment of tax by Lo as a result of any corporate tax liability must be indemnified by Holdings and Artiman.

///

///

## FIRST CLAIM FOR RELIEF

### (Equitable Indemnity Against Holdings and Artiman)

75. Third Party Plaintiff realleges and incorporates herein by this reference as though more fully set forth all the preceding and foregoing allegations of this Third Party Complaint.

76. By reason of the foregoing and as a direct and proximate result thereof, Third Party Defendants Holdings and Artiman owe equitable indemnity for all or part, according to proof, of any damages assessed against Lo herein, for which Lo seeks damages according to proof.

77. Because Artiman so treated Holdings as its own venture such that corporate separation was not achieved, and separate corporate formalities were not observed, such that, in essence, Artiman was the alter ego of Holdings, rendering it liable, along with Holdings, for equitable indemnity.

## SECOND CLAIM FOR RELIEF

### (Express Written Indemnity Against Holdings and Artiman)

78. Third Party Plaintiff realleges and incorporates herein by this reference as though more fully set forth all the preceding and foregoing allegations of this Third Party Complaint.

79. By reason of the foregoing and as a direct and proximate result thereof, Third Party Defendants Holdings and Artiman have breached the written, express Indemnity Agreement alleged herein, to Third Party Plaintiff's damages according to proof.

80. Because Artiman so treated Holdings as its own venture such that corporate separation was not achieved, and separate corporate formalities were not observed, such that, in essence, Artiman was the alter ego of Holdings, rendering it liable, along with Holdings, for express indemnity.

## THIRD CLAIM FOR RELIEF

### (Declaratory Relief Against Holdings and Artiman)

81. Third Party Plaintiff realleges and incorporates herein by this reference as though more fully set forth all the preceding and foregoing allegations of this Third Party Complaint.

82. By reason of the foregoing and as a direct and proximate result thereof, Third

Party Plaintiff Lo seeks a Declaration of this Court that Third Party Defendants Holdings and Artiman owe indemnity to Lo for any damages, costs and fees incurred as a result of the claims herein; and owe him indemnity for any future tax liabilities paid by Lo as a result of his service as an employee or officer of ANI, Holdings or IPR.

83.     Because Artiman so treated Holdings as its own venture such that corporate separation was not achieved, and separate corporate formalities were not observed, such that, in essence, Artiman was the <u>alter ego</u> of Holdings, rendering it liable, along with Holdings, for indemnity.

## FOURTH CLAIM FOR RELIEF

### (Defamation Against ANI, Holdings, Artiman and Shah)

84.     Third Party Plaintiff realleges and incorporates herein by this reference as though more fully set forth all the preceding and foregoing allegations of this Third Party Complaint.

85.     By reason of the foregoing and as a direct and proximate result thereof, Third Party Defendants, and each of them, have published defamatory statements against Lo by, on information and belief, written and oral statements to the Bank claiming falsely that Lo defrauded the bank and misdirected funds.  Lo prays leave to insert more precisely these statements when same have been obtained in discovery.  These defamatory statements caused Lo injury in his occupation, for which Lo seeks damages, according to proof, for harm to his general reputation and such special damages as may be shown.

86.     In performing the foregoing acts, Third Party Defendants, and each of them, acted oppressively, fraudulently and maliciously, for which Lo seeks punitive damages according to proof.

## FIFTH CLAIM FOR RELIEF

### (Tortious Interference with Contract Against Holdings, Artiman and Shah)

87.     Third Party Plaintiff realleges and incorporates herein by this reference as though more fully set forth all the preceding and foregoing allegations of this Third Party Complaint.

88.     By reason of the foregoing and as a direct and proximate result thereof, Third Party Defendants Shah, Artiman and Holdings have tortiously interfered in the agreements and

contractual promises made between ANI and Lo, and between IPR and Lo, for which Lo seeks damages according to proof.

89. In performing the foregoing acts, Third Party Defendants, Shah, Artiman and Holdings, acted fraudulently, maliciously and oppressively, for which Lo seeks punitive damages.

## SIXTH CLAIM FOR RELIEF

### (Fraud Against ANI, Holdings, Artiman and Shah)

90. Third Party Plaintiff realleges and incorporates herein by this reference as though more fully set forth all the preceding and foregoing allegations of this Third Party Complaint.

91. Since April, 2007, when Artiman took majority ownership in ANI and IPR, Third Party Defendants have known that Lo was advancing funds to ANI, and encouraged such funding, while promising Lo that he would be able to repay himself from company funds; represented and promised to Lo that Lo could repay himself from available cash flow as needed; and induced and directed Lo to pay off certain selected liabilities of IPR; and induced and directed Lo to make representations to the Bank with reference to the instant financing debts, liabilities, payments and representations.

92. As part of its scheme to defraud inventors, creditors, the Bank and taxing authorities, Third Party Defendants defrauded Lo by concealing from him their intent to disclaim their involvement in same, and claim Lo to be solely responsible for these payments without their direction or authorization.

93. Lo relied on the various representations and concealments herein alleged, made the disguised payments as alleged to the taxing authorities and otherwise paid taxes as directed, advanced money to and for the benefit of the Companies, and with the authorization of Third Party Defendants, repaid himself for the advances, and made representations to the Bank about the Companies' financial condition, while Third Party Defendants intended to disclaim as necessary any such direction, authority, encouragement or authorization; all to Lo's damage according to proof.

94.     In performing the foregoing acts, Third Party Defendants, and each of them, acted fraudulently, maliciously and oppressively, for which Lo seeks punitive damages.

## **PRAYER**

WHEREFORE, Lo claims damages against Third Party Defendants, and each of them, as follows:

1.  For indemnification according to proof;

2.  For general damages according to proof;

3.  For special damages according to proof;

4.  For punitive damages according to proof;

5.  For costs and expenses of this suit;

6.  For attorney's fees;

7.  For a Declaration of the Court that Lo be indemnified by Third Party Defendants as stated;

8.  For such other and further relief as the Court may deem proper.

Dated:  January 27, 2014                    O'CONNOR AND ASSOCIATES

                                            /s/_____
                                            JOHN D. O'CONNOR
                                            Attorneys for Defendant
                                            HENRY LO

## DEMAND FOR TRIAL BY JURY

Pursuant to Rule 38 of the *Federal Rules of Civil Procedure*, Third Party Plaintiff respectfully demands a trial by jury of any issues triable of right by a jury.


Dated: January 27, 2014                    O'CONNOR AND ASSOCIATES


                                           /s/_____
                                           JOHN D. O'CONNOR
                                           Attorneys for Defendant
                                           HENRY LO